Helen SEMLER, Administratrix of the
Estate of Natalia Semler,
Deceased, Appellee,

v.

PSYCHIATRIC INSTITUTE OF WASH-
INGTON, D.C., et al., Defendants,

v.

Paul FOLLIARD, Appellant.

Helen SEMLER, Administratrix of the
Estate of Natalia Semler,
Deceased, Appellee,

v.

PSYCHIATRIC INSTITUTE OF
WASHINGTON, D.C., INC., et
al., Appellants,

v.

Paul FOLLIARD, Third-Party Defendant.

Nos. 74–2345, 74–2346.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 10, 1975.

Decided Feb. 27, 1976.

Certiorari Denied Oct. 4, 1976.
See 97 S.Ct. 83.

Henry M. Massie, Jr., Asst. Atty. Gen. of Virginia, Richmond, Va. (Andrew P. Miller, Atty. Gen. and Stuart H. Dunn, Asst. Atty. Gen., Richmond, Va., on brief), for Paul Folliard.

Darryl L. Wyland, Falls Church, Va. (Anderson, Wyland, Yost & McMurtrie, on brief), for Psychiatric Institute of Wash-

ington, D.C., Inc., Psychiatric Institute of America, Professional Associates, and Ralph W. Wadeson, Jr., M.D.

Robert W. Lewis, Arlington, Va. (Lewis, Wilson, Cowles, Lewis & Jones, Arlington, Va., on brief), for Helen Semler.

Before CRAVEN, BUTZNER and RUSSELL, Circuit Judges.

BUTZNER, Circuit Judge:

These appeals arise from a negligence action brought by Helen Semler against Psychiatric Institute of Washington, D.C., Psychiatric Institute of America, Professional Associates of the Psychiatric Institute of Washington, D.C., and Ralph W. Wadeson, Jr., M.D.[1] Jurisdiction rests on diversity of citizenship. Mrs. Semler seeks recovery for the death of her daughter Natalia, who was killed by John Steven Gilreath, a Virginia probationer who had been a patient at the Institute. The original defendants filed a third party complaint against Paul Folliard, Gilreath's probation officer, seeking indemnification or contribution from him if they should be found liable. We will generally refer to the original defendants and the third party defendant collectively as the appellants. The district court, sitting without a jury, awarded the plaintiff $25,000 against the psychiatrists and required Folliard to contribute one-half of this judgment. We affirm.

### I

Gilreath had been indicted in Fairfax County, Virginia, for abducting a young girl in October 1971. Pending his trial, he entered the Institute for psychiatric treatment. His doctor, Ralph W. Wadeson, Jr., M.D., wrote Gilreath's attorney that he thought Gilreath could benefit from continued treatment and that he did not "consider him to be a danger to himself or others as long as he is in a supervised, structured way of life such as furnished here at Psychiatric Institute." In August 1972, after conferring with Doctor Wadeson, Judge William

Plummer of the state court sentenced Gilreath on his guilty plea to 20 years' imprisonment but suspended the sentence, conditioned on his continued treatment and confinement at the Institute.

A few months later, upon the doctor's recommendation and the probation officer's request, the state judge allowed Gilreath to visit his family for Thanksgiving and Christmas. Subsequently, again on the recommendation of the doctor, the judge allowed additional passes, and early in 1973 he authorized the probation officer to grant weekend passes at his discretion.

In May 1973, the doctor recommended that Gilreath

". . . be transferred to the status of a Day Care patient whereby he would be coming into the hospital at 8 o'clock each morning and leaving the hospital at 5 o'clock each evening. He would commute to and from the hospital with his parents and would spend weekends at home with his parents. He would be under parental supervision for nights and weekends and he would be under psychiatric supervision during the day while on the unit. This seems like a logical next step in the evolution of this young man's improved ability to function in society."

The probation officer transmitted this recommendation to the state judge, who approved it.

In the meantime, Gilreath became increasingly concerned about the financial burden on his parents for the cost of his treatment at the Institute. He also thought he would benefit if he could begin life anew with relatives in Ohio. In July 1973 the probation officer gave Gilreath a three-day pass to go to Ohio and investigate the possibility of moving there. Gilreath made tentative arrangements to work for his uncle and attend therapy sessions at a nearby hospital. The officer later gave Gilreath a fourteen-day pass so that he could return to Ohio in September to prepare for a transfer of probation to that state. The

---

1. These defendants stipulated that if Dr. Wadeson, the treating physician, were liable, they were jointly liable.

officer approved each of these trips after discussing them with the doctor, who felt that such a change would help Gilreath. Neither pass was submitted to the state judge for approval. On August 29, the doctor, assuming Gilreath would be accepted for probation in Ohio, wrote the probation officer that Gilreath had been discharged from the Institute.

The Ohio probation authorities, however, rejected Gilreath's application for transfer. He telephoned this news to his probation officer, who instructed him to return to Virginia. On September 19, Gilreath visited his doctor, who told him he should have additional therapy. The doctor did not restore Gilreath to day care status but instead enrolled him in a therapy group that met two nights a week. As an out-patient, Gilreath lived first at home and later alone, working as a bricklayer's helper. He told the probation officer about this arrangement, but the officer did not report it to the judge. In late September the officer was promoted, and a new probation officer was assigned Gilreath about October 1. Gilreath killed the plaintiff's daughter on October 29, 1973.

## II

■ Apparently, no Virginia case deals with a claim similar to Mrs. Semler's, so we must resort to the general principles of the Virginia law of torts. These have been succinctly stated in *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 780, 66 S.E.2d 441, 443 (1951), as follows:

"To constitute actionable negligence there must be a duty, a violation thereof, and a consequent injury. An accident which is not reasonably to be foreseen by the exercise of reasonable care and prudence is not sufficient ground for a negligence action."

We will consider each of these elements separately. The first is whether the appellants owed the public, including the decedent, Natalia Semler, any duty. This is a question of law. *Chesapeake & Potomac Telephone Co. v. Bullock*, 182 Va. 440, 29 S.E.2d 228, 230 (1944).

The judgment convicting Gilreath for abduction suspended his 20-year sentence on the general conditions of probation and the following special condition: "[T]hat he continue to receive treatment at and remain confined in the Psychiatric Institute until released by the Court." Both the doctor and the probation officer argue that this order created no duty on their part to Natalia Semler. They maintain that the purpose of the order was to rehabilitate Gilreath and that their duty extended only to him. Quite properly, we believe, the district judge rejected the appellants' limited interpretation of the order.

As we have noted, the Supreme Court of Virginia cautions that an unforeseeable accident is not actionable. *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 780, 66 S.E.2d 441, 443 (1951). Therefore, the nature of the appellants' duty depends in large part on the reasonable foreseeability of harm to the public, including the Semler girl, if Gilreath were released from the Institute in violation of the court's order. In this respect, the concepts of duty and proximate cause are related. *See* Prosser, Law of Torts 244 (4th ed. 1971).

Confinement of criminals frequently is intended to protect the public as well as to punish and rehabilitate the wrongdoer. But we need not rely on this generality to determine the nature of the duty imposed on Gilreath's custodians by the state court's probation order. The order itself discloses that the state trial judge had a dual purpose in placing Gilreath on probation. The judge's willingness to allow Gilreath to continue his private psychiatric treatment shows concern for his welfare. At the same time, the requirement of confinement until release by the court was to protect the public, particularly young girls, from the foreseeable risk of attack. This is demonstrated by the following facts. The presentence report informed the judge that on three previous occasions Gilreath had molested other young girls. The report also contained information about Gilreath's need for psychiatric treatment, and it specifically mentioned an observation of a physician

who had previously treated Gilreath that a "closed psychiatric facility would be best . . . ." It concluded with the probation officer's recommendation for continued treatment at the Institute. On the basis of the report, the judge imposed a lengthy sentence and, before placing Gilreath on probation, informed the doctor of his concern for the public.[2]

■ It is apparent that the decision to release Gilreath was not to be simply a medical judgment based on the state of his mental health. The decision would also entail a judgment by the court as to whether his release would be in the best interest of the community. The special relationship created by the probation order, therefore, imposed a duty on the appellants to protect the public from the reasonably foreseeable risk of harm at Gilreath's hands that the state judge had already recognized.

Section 319 of Restatement (Second) of Torts (1965) is close to the point. It provides:

"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

The Restatement measures a custodian's duty by the standard of reasonable care. Here, that standard has been delineated by the precise language of the court order. The appellants were to retain custody over Gilreath until he was released from the Institute by order of the court. No lesser measure of care would suffice. This obligation was not absolute, of course. The appellants would not be liable had Gilreath escaped despite their exercise of reasonable care, and they could surrender his custody to the court at any time. But they could not substitute their judgment for . the

court's with respect to the propriety of releasing him from confinement.

We hold, therefore, that the district court correctly concluded that the state court's order imposed a duty on the appellants to protect the public by retaining custody over Gilreath until he was released by court order.

## III

■ The second element of actionable negligence is breach of the duty imposed by law on the alleged tortfeasor. This is a factual question, *Virginia Electric & Power Co. v. Steinman*, 177 Va. 468, 473–74, 14 S.E.2d 313, 315 (1941), governed by the standards of Rule 52(a). The appellants, complying with the terms of the order, secured the trial judge's permission before transferring Gilreath to day care. Their principal contention is that the transfer from day care to out-patient status was simply a normal progression of treatment that required no additional judicial approval.

■ The district judge, however, found that there was a significant difference between day care and out-patient care. This finding is well documented by the evidence. As a day care patient, Gilreath was under the supervision of the Institute during the day. At night and on weekends he was supervised by his parents. His medication, which was essential to his treatment, could be carefully monitored, his condition readily observed, and, perhaps most importantly, the resources of the Institute could assist and sustain him in time of stress. In contrast, as an out-patient, Gilreath lived alone and attended only two therapy sessions a week. No one effectively monitored his medication, nor was he under constant observation. Moreover, he lacked the daily psychiatric supervision which, as the doctor had emphasized, was available to him as a

2. The doctor testified:

"Yes, [the judge] was very interested in the case. He seemed to have a thorough knowledge of John's [Gilreath's] situation, his past, his problems. He was concerned for the citi-. zens of Fairfax County. He was concerned for John. I felt that he gave me a very complete dissertation on his feelings about what was important and how serious the situation was."

day care patient. Thus, he did not have the resources or the environment of the Institute to sustain him in times of mental stress. In the light of these important considerations, we perceive no error in the district court's finding that the appellants breached the duty imposed on them by the order of probation when they failed to seek the trial judge's permission to transfer Gilreath to out-patient status.

■ The district court also found that the doctor could not justifiably rely on the probation officer's acquiescence in the transfer. The judge did nothing to clothe the probation officer with apparent authority to approve such a transfer. The officer never told the doctor that he was empowered to speak for the state trial judge, nor did he report that the judge had approved. Similarly, the probation officer could not rely on the doctor's judgment. He knew that his own authority was limited to granting passes and that the state judge had reserved to himself the authority to determine whether more significant changes of status should be allowed.

■ The appellants emphasize that the district court found the evidence insufficient to prove malpractice. This finding, however, does not exonerate them, for the doctor's duty was not restricted to providing acceptable treatment for Gilreath. On the contrary, it embraced, as we explained in Part II, a duty to comply with the court order so the public would be protected. The district court found that this duty was breached. Its finding is supported by the record and, consequently, Rule 52(a) requires its acceptance.

## IV

■ The last element of proof necessary to establish actionable negligence is, in the words of Virginia's Supreme Court, a "consequent injury." *Trimyer v. Norfolk Tallow Co.,* 192 Va. 776, 780, 66 S.E.2d 441, 443 (1951). This raises the issue of proximate cause, which the Virginia Court usually treats as a question of fact. *Standard Oil v. Williams,* 202 Va. 362, 366, 117 S.E.2d

93, 95 (1960). Addressing the issue in this manner, the district judge found, on the basis of expert psychiatric testimony, that it was less likely that Gilreath would have killed the plaintiff's daughter had he remained on day care. He also accepted as "clear and convincing" the expert's testimony that the tragedy was foreseeable if Gilreath were not kept on day care or closely confined. These subsidiary findings sustain the district judge's ultimate finding that the breach of the court order was a proximate cause of the plaintiff's loss. *Cf. Hicks v. United States,* 167 U.S.App.D.C. 169, 511 F.2d 407, 420–22 (1975). Moreover, as we noted in Part II, the probation order imposed on the appellants the duty to protect the public from assaults by Gilreath because this danger was reasonably foreseeable when the order was entered. The breach of this duty, followed by the foreseeable harm on which it was predicated, in itself demonstrates proximate cause. *Cf. Baltimore & Ohio R.R. v. Green,* 136 F.2d 88, 91 (4th Cir. 1943).

The appellants argue, however, that the evidence is insufficient to show that the state trial judge would not have approved Gilreath's transfer to out-patient status had a request been laid before him. There is no direct evidence on this point. Nevertheless, it is reasonable to infer from the proven facts that the judge would not have granted his permission. Gilreath had committed a serious crime, he was sentenced to long imprisonment, and he had been confined only a relatively short time at the Institute. Disclosure that Gilreath had initiated the Ohio venture, in part because of financial pressures, and Ohio's rejection of him as a probationer would have alerted the state judge to the problems his release might engender. Furthermore, the judge allowed Gilreath to be placed on day care status only after he had been assured in writing that the Institute would provide daily psychiatric supervision. The absence of this supervision and the other substantial differences between day care and out-patient status suggest the likelihood of the court's declining to allow the transfer, at least without further investigation.

The Institute argues that the evidence is insufficient to establish that Gilreath killed Natalia Semler and, therefore, that the plaintiff showed no causal connection between their conduct and the plaintiff's loss. We find no merit in this contention.

■ It is true that no witnesses were called to prove the crime, but this is not dispositive. The parties stipulated Gilreath had been convicted of the murder, and his confession was admitted into evidence without objection as a part of the probation officer's file. In accordance with the modern view, the court was free to assign this evidence the weight it saw fit. *See* Federal Rule of Evidence 803(22); Redden and Saltzburg, Federal Rules of Evidence Manual 280 (1975); Model Code of Evidence rule 521 (1942); McCormick, Evidence 738–41 (2d ed. 1972); *see generally* Note, Admissibility and Weight of a Criminal Conviction in a Subsequent Civil Action, 39 Va.L.Rev. 995 (1953); Annot., 18 A.L.R.2d 1287.

## V

The probation officer contends that he was improperly joined as a third party defendant and that he is immune from liability because he was performing a discretionary duty. We find no error in the district court's rejection of these defenses.

■ Though the plaintiff and the probation officer are citizens of Virginia, impleading the officer as a third party defendant under Rule 14(a) did not require diversity of citizenship. *Stemler v. Burke,* 344 F.2d 393, 395 (6th Cir. 1965); J. Moore, 3 Federal Practice §§ 14.25, 14.26 (2d ed. 1974).

■ Under Virginia law, a state employee who exercises discretionary judgment within the scope of his employment is immune from liability for negligence. Conversely, he is liable if injury results from the negligent performance of a ministerial act. *Lawhorne v. Harlan,* 214 Va. 405, 200 S.E.2d 569 (1973). No Virginia case has

applied these principles to the duties of a probation officer, but persuasive authority is not wholly lacking. A probation officer's basic policy decisions are discretionary and hence immune, but his acts implementing the policy must be considered on a case-by-case basis to determine whether they are ministerial. *Johnson v. State,* 69 Cal.2d 782, 73 Cal.Rptr. 240, 250, 447 P.2d 352, 362 (1968).

■ Virginia has adopted the following definition of a ministerial act: ". . . one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of, his own judgment upon the propriety of the act being done." *Dovel v. Bertram,* 184 Va. 19, 22, 34 S.E.2d 369, 370 (1945). Thus, it is apparent that the probation officer's recommendation of treatment at the Institute and his issuance of passes were discretionary rather than ministerial acts. However, the harm to the Semler girl did not result from the officer's discharge of these duties. The probation officer also was charged with the responsibility of laying requests for change in Gilreath's status before the state judge so the latter could grant or withhold approval. The district court properly ruled that this act was ministerial. It simply involved the officer's obedience to the mandate of the court order. He was obliged to see that Gilreath was not released from the type of confinement approved by the judge without the permission of the judge. This involved furnishing information to the judge and relaying the court's decision to the doctor. We hold, therefore, that the district court properly ruled that under Virginia law the probation officer was performing a ministerial act and consequently was not entitled to immunity. We also conclude that the evidence adequately supports the district court's finding that the officer's negligence contributed to the appellee's loss.

The judgments on both the complaint and the third party complaint are affirmed.