**Sherry Lynne DENNERT**

v.

**UNITED STATES of America.**

**Civ. No. 78–5083.**

United States District Court,
D. South Dakota.

Feb. 11, 1980.

James W. Olson, Rapid City, S.D., for plaintiff.

Jeffrey L. Viken, Asst. U. S. Atty., Rapid City, S.D., for defendant.

### MEMORANDUM OPINION

BOGUE, District Judge.

This case is a federal tort claim arising out of the rape of plaintiff. Plaintiff alleges that defendant, through its agency the Job Corps, was negligent in the supervising and handling of the rapist, Jeffery Culton. Culton, after resigning from the Job Corps Center at Box Elder, South Dakota, was dropped off in Rapid City, South Dakota, to await transportation to his home in Wichita, Kansas. After being dropped off, Culton raped plaintiff.

Plaintiff alleges that the Job Corps should have been aware that Culton was dangerous and that it negligently breached a duty to her and the public by leaving Culton unsupervised in Rapid City. In order to determine if the Job Corps should

have known that Culton posed a danger when left alone in Rapid City it is necessary to review the facts leading up to the rape.

Culton's initial problems with the law occurred in 1974. At age fourteen, he was placed at a boys' ranch in Kansas following his involvement in a couple of car thefts. The next couple of years he was involved in a number of thefts and was placed on probation. There is no evidence, however, that any of these crimes were of a violent nature.

Culton joined the Job Corps sometime during June of 1976. It appears that he was on probation at this time. The Kansas court, however, released its jurisdiction over him upon his entering the Job Corps (Exhibit 2, nos. 15 and 16a).

Culton entered training at the Weber Basin, Utah Job Corps Center on July 14, 1976. On September 18, 1976, while still at Weber Basin, Culton sexually assaulted a young woman after threatening her with a knife. On October 26, 1976, Culton was found guilty of aggravated sexual assault and was committed to the Utah State Hospital for evaluation.

The report to the court from the Utah State Hospital concluded that Culton had some serious learning problems and suffered from low self-esteem. However, the hospital found no evidence that Culton was dangerous. The report stated:

> Our examination results also reveal that Jeffery is basically a quiet, cooperative, young man who seems to have a reasonable amount of emotional control and shows no evidence of excessive aggression or hostility. No thought disorder, psychotic thinking or sexual deviance or preoccupation was noted.

In conclusion, the hospital's report recommended that the Job Corps program would probably benefit Culton.

After being returned from the Utah State Hospital, Culton was sent to the Utah State Industrial School for further evaluation. The Industrial School report reached basically the same conclusions as had the State Hospital in regard to Culton's learning difficulties and his low self-esteem.

They also recommended the Job Corps as being potentially helpful to Culton.

Presumably on the basis of the recommendations from the State Hospital and the State Industrial School, on January 18, 1977, Culton was transferred from the Industrial School back to the Weber Basin Job Corps Center from where he was to be transferred to a Job Corps center in Colorado. However, due to space problems in Colorado he was sent to Box Elder, South Dakota instead. He arrived there on January 26, 1977.

Culton apparently had a difficult time adjusting to life at Box Elder. A counseling report dated January 28, 1977, reported that Culton would not participate in discussions and other activities and that there was a good chance he would go AWOL. On February 12, 1977, Culton was punished by a review board for assaulting a fellow corps member. Shortly after this incident Culton expressed a desire to leave the Job Corps. On February 15, 1977, Culton was granted an administrative leave.

In early March, after promising to abide by all rules of the center, Culton returned to Box Elder. His problems, however, continued. About a week after his return he was involved in a controversy about a stolen watch. Two days later he failed to report for work and indicated he had no intention of going to work. As a result of this incident, another review board was recommended. Instead of facing the review board, Culton decided to resign from the Job Corps. Arrangements were made to transport him to his home in Wichita. He was scheduled to leave by bus at 1:30 a. m. on March 28. He was taken from Box Elder and dropped off in Rapid City shortly after 7:00 p. m. on March 27. Sometime after being dropped off he assaulted plaintiff. On October 6, 1977, he pled guilty to rape and was sentenced to seven years in the South Dakota State Penitentiary.

Plaintiff alleges that the Box Elder Job Corps Center should either have not let Culton wait for his bus alone or notified local police that he was being dropped off

and was dangerous. Secondly, plaintiff contends that Utah and Kansas court authorities should have been notified of Culton's resignation so they could reassume jurisdiction over him. One question to be dealt with is whether the Box Elder Job Corps Center should have known that Culton was dangerous and posed a threat to the public by being left unsupervised.

Before this can be determined, another issue must be addressed. Plaintiff contends that the Weber Basin Job Corps Center failed to supply the Box Elder Job Corps Center with sufficient information about the sexual assault in Utah to enable Box Elder to make an informed decision about leaving Culton alone in Rapid City. Plaintiff further contends that Box Elder probably would have treated Culton differently if all the information about the Utah incident had been provided to them.

There is some confusion as to how much the staff at Box Elder knew about the Utah incident. Apparently the only documents relating to the incident sent to Box Elder from Weber Basin were Exhibits 19 and 38. Exhibit 38 is a record of Culton's educational progress. It also contains personal data. On page 3 of the exhibit, under the category of "Discipline and Legal Services," the document indicates that Culton retained an attorney as a result of his involvement in an aggravated sexual assault. It provides no specific facts about the incident. Exhibit 19 is a resume prepared by the head counselor at Weber Basin. Under the personal data section it states:

> Jeffrey (sic) entered training at Weber Basin on July 14, 1976. After a short stay at the Center, Jeffery became involved with an individual in town which resulted in court action. When he appeared for final sentencing, the Judge ordered Jeffery remain in the Job Corps and complete his training but that it be in another state. Jeffery transferred to Box Elder Job Corps in South Dakota. We feel he will be successful in their program and wish him the best of luck.

Richard Brown, one of Culton's counselors at Box Elder, testified that these documents were the only source of information he had regarding Culton's involvement in the Utah rape. His testimony indicated he knew very little about the Utah incident until after the Rapid City incident had occurred.

In addition to the above-mentioned exhibits, a telephone call was made concerning Culton by Val Rohde, a counselor at Weber Basin, to Van Girard, Box Elder's deputy director. At trial Rohde testified that he told Girard about the rape incident in Utah and made him aware that force and a dangerous weapon had been involved. However, a report prepared by Girard after Culton's arrest in Rapid City contradicts Rohde's testimony. In the report Girard states:

> Mr. Rohde described the need for transfer as due to the Corpsman having been through court on an aggravated rape charge and the Judge requiring he be removed from the state of Utah. Mr. Rohde said he had followed the case closely and felt it was a normal boy-girl relationship that went a bit too far; the girl then having had second thoughts and cried rape. He felt Jeffery Culton had received rather a bum deal as he had been a good Corpsman and still was liked and respected by the people of Weber Basin. (Exhibit 34.)

Girard's report goes on to state: "Aside from the verbal exchange with Mr. Rohde and the reports I have attached from Weber Basin, we had no additional information on Jeffery's problem in Utah until I spoke with Jim Mumey from the DOL Regional Office on 3–25–77." Mumey apprised Girard of the facts of the Utah incident. In referring to the information given him by Mumey, Girard further stated: "The latter report of course conflicts with the one provided by Weber Basin's counselor and creates questions regarding this transfer if it was known that Jeffery was the type of person to threaten with a knife and forcibly rape a strange girl."

Brown's testimony and Girard's report indicate that Box Elder was not fully informed regarding the circumstances sur-

rounding Culton's conviction in Utah. Although Weber Basin probably should have provided Box Elder with all the information about the Utah rape, it does not appear that their failure to do so was significant. Taking into account all the available information regarding Culton, it does not appear he should have been considered dangerous when he left Weber Basin.

Prior to the rape incident in Utah four reports were written at Weber Basin regarding misconduct by Culton. In only one of these incidents was violence involved—that being a minor fight with a fellow Corps member. Therefore, prior to the Utah rape, Culton had not exhibited any unusual violent tendencies.

After the rape Culton was sent to two separate institutions for evaluation. Both of these institutions concluded that Culton was not an excessively violent individual. Based on these reports, the court returned Culton to the Job Corps. The Job Corps did not have access to these reports. However, the fact that the Utah court allowed Culton to return to the Job Corps with no restrictions placed upon him would seem to indicate that, at least in the court's mind, Culton did not pose a danger to the public. The Job Corps is a completely voluntary program and Culton was free to leave at any time. If a court releases a person to the Job Corps with no restrictions placed on him, the Job Corps should not be saddled with the duty of second guessing the court by having to place their own restrictions on the individual.

After leaving Weber Basin the reports which Box Elder received regarding Culton were generally favorable. The Weber Basin staff felt Culton would do well at Box Elder. Even if Box Elder had been aware of all the facts surrounding the Utah rape, it is difficult to see how they could have considered Culton dangerous in light of the action by the Utah court and the opinions of the Weber Basin staff.

As stated previously, Culton had several problems while at Box Elder. The only one involving violence, however, was the fight for which he was brought before the review board. Other than that the complaints about him at Box Elder were mainly concerned with his lack of motivation. Furthermore, Richard Brown testified that Culton's behavior, as far as fighting was concerned, and was not any different from that of a number of other corpsmen.

Another factor to consider in determining whether Culton should have been considered dangerous is his behavior during the times he had previously been on his own. Between the time of the Utah and South Dakota rapes Culton travelled alone by bus three times. His first trip was from Weber Basin to Box Elder. Later, while he was on administrative leave, he travelled from Box Elder to Wichita and back again. There is no evidence that he encountered any difficulties during any of these trips.

■ Looking at all the evidence available regarding Culton prior to the rape in Rapid City, it does not appear that he necessarily should have been considered dangerous. Although he had committed some acts of violence, the action of the Utah court, and reports from the Utah State Hospital, the Utah Industrial School and Weber Basin, plus the lack of any incidents on his other trips, would seem to indicate that he was not dangerous. Therefore, it does not appear the Job Corps violated any duty to the plaintiff by dropping Culton off in Rapid City or by not notifying the local police that they were doing so.

That brings us to the question of whether Box Elder had any duty to notify court authorities in Kansas or Utah. The Code of Federal Regulations requires the notification of court representatives when a corps member who is on parole or probation is terminated. 29 C.F.R. § 97a.124. As far as notification of Kansas authorities is concerned, as stated previously, the Kansas court had released its jurisdiction over Culton when he went into the Job Corps. Therefore, there would seem to be no obligation on the part of the Box Elder Job Corps Center to notify the Kansas court authorities when Culton resigned.

In regard to notification of Utah court authorities, the key question is whether Culton was on probation at the time he was sent back to the Job Corps from the State Industrial School. There are indications in several exhibits that he was placed on probation with the condition that he complete the Job Corps program. In a narrative statement of the case accompanying his statement of fees, Culton's Utah attorney stated that probation officials indicated to him that Culton would be placed on probation prior to his return to the Job Corps (Ex. 12). Furthermore, in the resume of Culton prepared by the head counselor at Weber Basin, it was stated that the judge in Utah had ordered Culton to complete his Job Corps training (Ex. 19). And finally, in a teletype prepared by Weber Basin and sent to the regional office it is stated that Culton was sentenced to remain in the Job Corps until he successfully completed the program (Ex. 36, p. 7). In addition, there was some testimony at trial to the effect that Culton was placed on probation in Utah. This Court, however, must look at the best evidence available in deciding this issue. That evidence is the actual court order. The order reads as follows: "That the above named child be and is hereby released from the Utah State Industrial School to the Weber Basin Job Corps; said child is to be transferred to the Job Corps in Cuba, Colorado." (Ex. 17.)

The above-quoted order clearly did not impose a probationary period upon Culton or place any conditions on him. Therefore, this Court finds that Culton was not on probation when he was permitted to return to the Job Corps. Since Culton was never put on probation in Utah, Box Elder had no duty to notify the Utah court authorities when Culton resigned.

Plaintiff also claims that under the federal regulations Culton should have been provided with an escort after leaving Box Elder. The applicable regulation provides for an escort when such is necessary for medical reasons. It goes on to state: "The regional office may also approve a Center Director's request for transportation for escorts under other extraordinary or emergency situations such as accompanying the remains of deceased corpsmembers." 29 C.F.R. § 97a.39(c). Culton's release cannot be considered an extraordinary or emergency situation and thus, an escort was not necessary.

Plaintiff cites a number of other instances in which she claims the Weber Basin and Box Elder Job Corps Centers violated certain federal regulations. This Court finds that even though there may have been some technical violations of the federal regulations, none of these violations were a proximate cause of the assault on the plaintiff.

Plaintiff relies on a number of negligent release cases in support of her position that defendant was negligent and is liable for her injuries. In these cases the United States or other government entity was held liable for negligently releasing or failing to supervise a person who subsequently attacked and injured or killed another. *Rieser v. District of Columbia*, 183 U.S.App.D.C. 375, 563 F.2d 462 (D.C.Cir.1977); *Semler v. Psychiatric Institute of Washington, D.C.*, 538 F.2d 121 (4th Cir. 1976); *Hicks v. United States*, 167 U.S.App.D.C. 169, 511 F.2d 407 (D.C.Cir.1975); *Gibson v. U. S.*, 457 F.2d 1391 (3rd Cir. 1972); *Underwood v. U. S.*, 356 F.2d 92 (5th Cir. 1966); *Fair v. U. S.*, 234 F.2d 288 (5th Cir. 1956); *Williams v. U. S.*, 450 F.Supp. 1040 (Dist.S.D.1978). These cases are all distinguishable from the one at bar. In all of them but *Gibson*, the attacker was released from a psychiatric hospital or under court supervision prior to the attack. Unlike Culton, the attackers were not free men enrolled in a voluntary program. *Gibson*, like the case at bar, involved an attack by a Job Corps member. The Corps member attacked an instructor with a screwdriver. The attacker, however, was a known drug addict with a history of violence. The United States was found to have been negligent in not providing protection from someone whose instability was well known. The evidence of any instability on Culton's part was not as well established. Thus, the *Gibson* case does not govern here.

There are numerous other factors which help distinguish the cases cited by plaintiff from the one at bar. For instance, in *Underwood*, the attacker, a serviceman, had frequently threatened to kill his wife. Nonetheless, he was released from the hospital and given access to a gun which was eventually used as the murder weapon. Furthermore, in *Williams*, the police had asked to be notified if a certain mental patient was to be released. The V. A. Hospital failed to do this and the patient attacked and killed plaintiff's decedent. The same was true in *Hicks*, where the patient's wife was to be notified, because of her fear of her husband, and in *Semler*, where a court was to be notified. In both cases notification was not made and after their release both patients committed a murder. In *Hicks*, the victim was the wife who was supposed to have been notified. Unlike these cases, no one specifically asked the Job Corps for notification upon Culton's release.

Another distinguishing feature of the negligent release cases cited by plaintiff is that in all of them the eventual behavior of the attacker could have reasonably been foreseen. A common thread running through the cases is that the attackers had long histories of violent behavior. Such is not the case with Jeffery Culton. While it is true he had exhibited violent behavior in the past, it was not unreasonable to assume that he was not a danger to the public.

Culton was released by the Utah court to return to the Job Corps. No restrictions were placed on him. If it was felt he was dangerous, it was the court's responsibility to do something about it, not the Job Corps'. Since he was released by the court it was reasonable for the Job Corps to assume that Culton was not dangerous. While his subsequent behavior at Box Elder was far from model, it was not so bad as to make the staff at Box Elder aware that they were releasing a person who was a threat to the public. The evidence did not establish that the Job Corps breached a duty to the plaintiff by leaving Culton unsupervised in Rapid City or that any of their actions were a proximate cause of the rape of plaintiff. Therefore, this court finds no liability on the part of defendant for any damages suffered by plaintiff.

The foregoing conclusions shall constitute the Court's findings of fact and conclusions of law.