526 F.Supp. 443 (1981)
Leona BERGMANN, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 79-1041C(4).
United States District Court, E. D. Missouri, E. D.
September 16, 1981.
*444 *445 Robert C. Ely, Ely & Wieland, St. Louis, Mo., for plaintiff.
Joseph B. Moore, Asst. U. S. Atty., Dept. of Justice, St. Louis, Mo., for defendant.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court for a decision on the merits following a two-day bench trial on July 20, and 21, 1981.
Plaintiff brings this wrongful death action under the Federal Torts Claims Act, 28 U.S.C. § 2671 et seq. The action arises from the murder of plaintiff's husband, a city police officer, while investigating a burglary perpetrated by a participant in the federal witness security program.
Having considered the pleadings; testimony of witnesses, documents, and other evidence adduced at trial; and being otherwise fully advised in the premises, the Court hereby makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff's husband, Fred Bergmann, was an auxiliary police officer for the City of St. Charles, Missouri. In performance of his duties, Officer Bergmann was shot on September 12, 1976, while interrupting a burglary at the St. Charles gas company. After extensive surgery, Officer Bergmann clung to life for a few weeks and then died of complications.
2. In May of 1977, Benjamin Rosado, also known as Benjamin Russo, was implicated in the Bergmann killing. Formally charged with murder in August of 1977, Rosado was found guilty after a full trial in the state court and sentenced to life imprisonment.
3. At the time of the Bergmann killing, Rosado and his immediate family were participants in the federal witness security program established by Pub.L. 91-452, Oct. 15, 1970, which in pertinent part provides:
Sec. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.
Sec. 502. The Attorney General of the United States is authorized to rent, purchase, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for so long as the Attorney General determines the jeopardy to his life or person continues.
4. Rosado had become a protected witness on June 17, 1976, to provide testimony against organized crime figures in New York City, particularly related to the death of a government informant, Tony Finn. Rosado had been present when Finn was *446 beaten and shot to death because he had provided information to the government concerning illegal drug traffic.
5. Rosado had a criminal record known to the Assistant United States Attorney, John P. Cooney, who requested protection for Rosado. The identification record on Rosado from the Federal Bureau of Investigation contains the following arrests and convictions:

1952 and 1954  imprisoned for assault and unarmed robbery.
1957  charged with burglaryno disposition.
1957  charged and convicted of a Dyer Act violation
 (car theft); sentenced to 3½ years imprisonment.
 He was paroled, then violated
 that parole by carrying a knife.
1961  charged and convicted of unarmed robbery;
 sentenced to 7½ to 20 years imprisonment.
1962  charged with armed robberyno disposition.
1974  charged with rape, sodomy, and incestno
 disposition.
1974  charged with robberyno disposition.
May 22, 1976  charged with burglary, grand larceny, fire-armno
 disposition.

The teletype request for witness protection for Rosado to the Criminal Division of the Department of Justice portrays a person with underworld connections. Rosado's presence at the Finn murder suggested familiarity with the narcotics, extortion, and contract killing aspects of organized crime. As well as indicating that Rosado possessed information related to two other murder cases, the teletype request indicates that Rosado was acquainted with Patty Huston, a known bank robber on the FBI's list of Top Ten Most Wanted Criminals in 1976. Finally, the teletype request included information that Rosado faced pending burglary charges in the Court of Queens County, New York.
6. The procedures for establishing a person as a protected witness are set forth in Department of Justice Order OBD 2110.2, dated January 10, 1975. Paragraph 6 of the order sets forth the following conditions for participation in the witness protection program:
(1) The person is a qualifying witness in a specific case in process or during or after a grand jury proceeding;
(2) Evidence in possession indicates that the life of the witness and/or that of a member of the witness' family or household is in immediate jeopardy; and
(3) Evidence in possession indicates it would be advantageous to the federal interest for the Department to protect the witness and/or a family or household member.
Paragraph 7 of the order directs that requests for protection of a witness shall be made by a United States Attorney; the Assistant Attorney General in charge of the concerned division, or his designee, shall determine whether a proposed witness meets the criteria for protection.
7. The Rosado teletype request for protection went through normal channels in the Justice Department from initiation to final approval. Assistant United States Attorney John P. Cooney made the initial request through Robert B. Fiske, Jr., United States Attorney for the Southern District of New York.
From the United States Attorney's office, the teletype request was directed to Thomas J. O'Malley, who testified that he immediately referred the matter to Stephen Harwood because he, O'Malley, no longer handled such matters. Having found that the criteria of OBD 2110.2 were met, Harwood forwarded the request to his superior, Morton Sitzer, who approved the request and referred it to the Chief of Narcotic and Dangerous Drug Section, Kurt W. Muellenberg.
After reviewing the teletype request, emergency protection for Rosado was authorized by Robert L. Keuch, a Deputy Assistant Attorney General, who was designated to make final approval for the Assistant Attorney General pursuant to paragraph 7(b) of OBD 2110.2, supra. Keuch testified that he has no recollection of the request for protection of Rosado.
8. The Assistant United States Attorney, Cooney, was the only government official in the above channeling of the teletype request for protection who considered whether Rosado would return to crime in *447 the relocation area. In processing the request, only Cooney met with Rosado, reviewed his FBI identification record, and discussed his past crimes with him as well as his involvement in the murder cases in which he was offering testimony.
At the time Cooney requested protection for Rosado, Rosado was charged with burglary in Queen's County, New York, but Cooney coordinated with the Queen's County prosecutor so that Rosado could participate in the witness protection program.
Cooney understood that Rosado's activities would not be monitored in the relocation area and that his identity would not be known to the local police.
Cooney testified that the only steps he took to prevent Rosado from returning to crime in the relocation area were to admonish Rosado that he must not return to crime and that if he did, his privileges under the program would be terminated.
9. After approval of Rosado and his family as protected witnesses, the United States Marshals Service undertook the actual protection tasks, following the guidelines of OBD 2110.2, supra, which direct that
The witness will normally be relocated to a place of safety, given a new identity and assisted in securing housing and employment in order to become self-sufficient.
The Marshals Service took steps to effectuate the legal name change from Rosado to Russo and relocated the family to a place of safety  St. Charles, Missouri. The Marshals Service arranged for the rental of an automobile, an apartment, the establishment of credit with service companies, and the placement of one of the Rosado children in school.
10. There is no evidence of regulations or records of the Marshals Service monitoring the activities of a protected witness on a 24-hour basis where the witness is not in legal custody, a prisoner, or a committed mental patient.
The marshals were not authorized to disclose the true identity of any protected witness or the fact that an individual was a protected witness, unless the protected witness was arrested and local authorities requested his name and the Department of Justice authorized the release of the witness' true identity.
The Marshals Service did not inform the local law enforcement officials in the St. Charles, Missouri, area of Rosado's previous identity until after Rosado was implicated in the Bergmann shooting.
11. The director of the United States Marshal Service has stated that the greatest threat to a witness in the witness protection program is his or her own self-destructive tendencies, including tendencies to recommence a criminal career. Hearings on Department of Justice Witness Protection Program Before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary, 95th Cong., 2d Sess. 18 (1978) (statement of William E. Hall).
The United States Attorneys and employees of the United States Marshals Service testified that the most important means of preventing a relocated witness from returning to crime in a relocation area is to ensure that the witness is employed.
The importance of securing employment for the protected witness is emphasized in the departmental guidelines for the program, OBD 2110.2, supra. Although acquisition of gainful employment is the responsibility of the protected witness, paragraph 11 of the order directs that
Job assistance, when necessary, will be provided by the Witness Security Division of the U.S. Marshals Service, but will be limited to assisting the protected person in locating one reasonable job opportunity. If this job is refused, maintenance may be terminated immediately. If a reasonable job opportunity cannot be developed within 60 days following the last court appearance, maintenance may be terminated.
The United States Marshals Service did not set up any job interviews for Rosado, and Rosado did not arrange any job interviews on his own. Rosado never was employed *448 during the time he was relocated in St. Charles, Missouri, as a participant in the witness protection program.
12. The Marshals Service Witness Security Specialist testified that he would contact Rosado on a weekly basis when he could, but the specialist admitted that he did not make the contact every week.
The Marshals Service records indicate that the Marshals Service contacted Rosado six times in June and July of 1976, but then did not have contact with Rosado again until October 22, 1976, when Rosado contacted the Marshals Service after being arrested for breaking and entering.
13. Plaintiff, Mrs. Bergmann, expended $36,077.91, on Officer Bergmann's medical expenses connected with the shooting, and $3,000.00 for her husband's funeral. Officer Bergmann was contributing $5,000.00 each year to the Bergmann family income at the time of his death.
14. Based on the 1971 Individual Annuitant Mortality Table, in Volume 42 of Vernon's Annotated Missouri Statutes, Officer Bergmann had a life expectancy of 31.46 years at age 47. The Court assumes that Officer Bergmann would have retired at age 65 and been eligible for social security thereafter until his natural life ceased.

CONCLUSIONS OF LAW
1. This Court has jurisdiction over the parties and the subject matter under 28 U.S.C. § 1346, which provides that the district court:
shall have exclusive jurisdiction of civil actions in claims against the United States under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
Plaintiff bases her cause of action on the Missouri wrongful death statute, Mo.Rev. Stat. § 537.080.
2. While a private person generally has no duty to prevent the commission of a tort or crime, under Missouri law, a person may be charged with a duty to take precautions to protect others from intentional criminal acts or reckless conduct of third persons. Compare Irby v. St. Louis County Cab Co., 560 S.W.2d 392, 395 (Mo.App.1977) (no duty for cab company to protect cab driver against intentional criminal conduct of unknown third person when dispatching driver to high crime area) with Scheibel v. Hillis, 531 S.W.2d 285 (Mo.1976) (duty to prevent injury when defendant knew of vicious propensities of third person and fact that third person knew of a loaded gun kept in the home of the defendant).
The defendant contends that Scheibel is distinguishable from the case before this Court because it involved principles of negligence for landowners.
The duty to protect others from misconduct by third persons is not limited to landowners under Missouri law. See, e. g., Zuber v. Clarkson Construction Co., 363 Mo. 352, 251 S.W.2d 52, 55 (1952) (duty imposed on construction company to supervise earth moving equipment in an area where people are known to gather).
Such a duty arises when one should realize through special facts within his knowledge or a special relationship that an act or omission exposes someone to an unreasonable risk of harm through the conduct of another. Restatement (Second) of Torts § 302B and Comments. See, e. g., Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (duty to provide lighthouse because of known navigational hazards); United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (duty to protect a prison inmate from other inmates). See also Johnson v. California, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968) (holding state liable for placing a minor with homicidal tendencies in plaintiff-victim's home).
As revealed by the FBI identification record on Rosado and the teletype request for protection, supra, the government attorney requesting protection for Rosado had special facts within his knowledge concerning the criminal history of Rosado, including repeated imprisonment for robbery. *449 Because the government could have expected Rosado to continue his pattern of criminal behavior, the government's selection of Rosado for the witness protection program exposed Officer Bergmann to a risk of harm which could have been foreseen. See Downs v. United States, 522 F.2d 990 (6th Cir. 1975) (duty to pilot killed by hijacker when FBI refused hijacker's demands); Rogers v. United States, 397 F.2d 12 (4th Cir. 1968) (duty to probationer tortured while in custody of person previously indicted for chaining and physically abusing another).
3. The defendant asserts that the federal witness protection program established by Pub.L. 91-452, supra, does not create a special relationship which would impose a duty on the government to supervise or control Rosado.
Section 319 of Restatement (Second) of Torts, provides that
One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.
The determination of a cause of action under § 319 turns on the relationship between the defendant and the tortfeasor. See, e. g., Rieser v. District of Columbia, 563 F.2d 462, 475 (D.C.Cir.1977) (parolee); Semler v. Psychiatric Institute of Washington, D.C., 538 F.2d 121, 127 (4th Cir.), cert. denied 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 90 (1976) (probationer/outpatient); Fair v. United States, 234 F.2d 288 (5th Cir. 1956) (Air Force released psychotic officer from base hospital).
The defendant attempts to distinguish Rieser, Semlar and Fair, arguing that the voluntary aspect of the witness protection program is different from the custodial nature of a parole, probation, or hospitalization program. See Dennert v. United States, 483 F.Supp. 1317, 1321 (D.S.D.1980).
Other courts have not limited the application of § 319 to custodial relationships. For example, in Liuzzo v. United States, 508 F.Supp. 923, 935 (E.D.Mich.1981), the court refused to dismiss a claim based on allegations that the FBI authorized unreliable and unstable informant to participate in activities which culminated in the murder of plaintiff's mother and that FBI agents failed to prevent the harm, which they knew or should have known would occur.
Reviewing the record, this Court concludes that by permitting Rosado to participate in the witness protection program, the government created a special relationship which required the government to exercise reasonable care to control Rosado. Although the government had special facts within its knowledge concerning Rosado's criminal propensities, the government relocated Rosado from New York City to St. Charles, Missouri, with a new identity but without taking measures to prevent Rosado from engaging in the criminal activities which resulted in the murder of plaintiff's husband.
4. Notwithstanding any negligence in permitting Rosado to participate in the witness protection program, the defendant maintains that plaintiff failed to show that the government's negligence was the legal cause of the Officer Bergmann's death as required by Missouri law. See generally Patrick v. Perfect Parts Co., 515 S.W.2d 554, 556 (Mo.1974).
The Missouri courts have adopted the test for legal cause set forth in § 431 of the Restatement (Second) of Torts; negligent conduct constitutes a legal cause of harm if the conduct is a substantial factor in bringing about the harm. Ricketts v. Kansas City Stock Yards Co., 484 S.W.2d 216, 221-22 (Mo.1972).
Defendant argues that the failure of the government to warn local police of Rosado's presence in the community or to monitor his activities could have no effect on Rosado's reaction to Officer Bergmann's interruption of his burglary attempt.
The defendant's narrow focus on the events immediately preceding Officer Bergmann's death overlooks other testimony concerning the government's failure to supervise Rosado's participation in the witness *450 protection program. For example, § 502 of Pub.L. 91-452, supra, provides that the government is authorized
[to secure housing] and to otherwise offer to provide for the health, safety, and welfare of witnesses ...
Although departmental guidelines for implementing the witness protection program, OBD 2110.2, supra, specifically direct that a protected witness will normally be assisted in securing employment, the United States Marshals Service did not set up any interviews for Rosado; Rosado never was employed during the time he was relocated in St. Charles, Missouri. The United States Marshal testified that he would contact Rosado on a weekly basis when he could, but he admitted that he did not make the contact every week. The Marshals Service records indicate that Rosado was contacted six times in June and July of 1976, but he was not contacted again until October 22, 1976, when the Marshals Service contacted him concerning his arrest for breaking and entering.
Having considered the government's failure to follow statutory and departmental guidelines for securing the welfare  as well as the health and safety  of its protected witness, Rosado, the Court concludes that the lack of supervision of Rosado's participation in the witness protection program was a substantial factor in bringing about the harm to plaintiff's husband.
5. Even assuming that the death of plaintiff's husband was caused by the government's negligent selection and supervision of Rosado as a protected witness, the defendant asserts that it is nonetheless exempt from liability under the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a). Section 2680(a) excepts from the general waiver of sovereign immunity:
Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
Whether plaintiff's claim is barred by § 2680(a) must be determined by measuring the government action against the broad spectrum of administrative power which ranges from the discretionary establishment of programs and issuance of regulations to the narrow decisions where administrative discretion stops and liability in tort begins. Compare Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) with Indian Towing Co. v. United States, supra.
The federal witness security program delegates to the United States Attorney General the authority to use his or her judgment in providing protection to witnesses who may be endangered. P.L. 91-452, supra. The defendant maintains that the nature of the actions necessary to provide protection of witnesses dictates wide discretion in field personnel to ensure the safety of witnesses. Leonhard v. Mitchell, 473 F.2d 709, 714 (2d Cir.), cert. denied, 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973).
The defendant correctly argues that the government cannot be liable for the formulation of policy with regard to how its protected witnesses are to be selected and supervised. Plaintiff, however, does not challenge the witness protection program policy as negligently formulated, even to the extent that the policy permits criminals to participate in the program. Rather, plaintiff attacks the implementation of that policy vis-a-vis Benjamin Rosado. See Liuzzo v. United States, supra, at 931, stating that the mere exercise of judgment does not automatically insulate the government from liability.
The decision of the Assistant United States Attorney to request protection for Rosado and approval by the Deputy Assistant Attorney General were responses to a particular situation. See White v. United States, 317 F.2d 13, 17 (4th Cir. 1963).
After Rosado's participation was approved, the United States Marshals Service operated under the Department of Justice policy for supervising protected witnesses. Neither the government attorneys nor the marshals were formulating policy when selecting *451 and supervising Rosado; their actions were not meant to guide the actions of other government officials faced with similar situations. Compare United States v. Faneca, 332 F.2d 872 (5th Cir. 1964) cert. denied, 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965) (immunity from liability for formulation of plans and manner of control of government personnel in carrying out their duty to maintain law and order) with Swanner v. United States, 309 F.Supp. 1183 (M.D.Ala.1970) (discretionary function exception does not prevent suit for negligent failure to protect informant after decision to investigate and prosecute had already been made).
The court concludes that plaintiff's claims based on the implementation of the witness protection program policy with regard to Rosado's selection and supervision are not barred by 28 U.S.C. § 2680(a).
6. The defendant argues that the government is also exempt under the intentional tort exception to the Torts Claims Act, 28 U.S.C. § 2680(h), if Rosado is considered an employee of the government. See Naisbitt v. United States, 611 F.2d 1350, 1355 (10th Cir. 1980), cert. denied, 449 U.S. 885, 101 S.Ct. 240, 66 L.Ed.2d 111 (1981).
As a protected witness, Rosado was not a government employee. Therefore, plaintiff's claims are not barred by § 2680(h).
7. Finally, defendant argues that plaintiff's theories of negligence imply that the government, by not disclosing Rosado's criminal record to local authorities, represented that he was not dangerous to the community. See United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961).
Finding no allegations of misrepresentations by the government, the Court concludes that plaintiff's claims that the government negligently selected and supervised Rosado are not barred by 28 U.S.C. § 2680(h).
8. Having found that defendant negligently permitted and supervised Rosado's participation in the witness protection program, the Court concludes that plaintiff is entitled to judgment in the amount of $69,077.91.
Plaintiff's recovery is governed by Mo. Rev.Stat. § 537.090 and 28 U.S.C. § 2674. Missouri law allows the trier of fact to consider aggravating circumstances in awarding compensatory damages. The award of additional damages for aggravating circumstances is punitive in nature. Wiseman v. Missouri Pacific Railroad Co., 575 S.W.2d 742, 752 (Mo.App.1979). Punitive damages may not be recovered under 28 U.S.C. § 2674.
Plaintiff may recover her pecuniary loss for the expenses of her husband's medical treatment ($36,077.91), the funeral expense ($3,000.00), and the loss of services and income to the Bergmann household. Mo.Rev. Stat. § 537.090. Buechel v. United States, 359 F.Supp. 486 (E.D.Mo.1973). Plaintiff may not recover damages for grief and bereavement under Mo.Rev.Stat. § 537.090, but plaintiff may recover for loss of the love, companionship, and consortium of her husband and may recover for mental anguish she experienced because of her husband's death, not attributable to grief and bereavement. Wyatt v. United States, 470 F.Supp. 116 (W.D.Mo.), aff'd, 610 F.2d 545 (8th Cir. 1979).
Plaintiff testified that she had extreme difficulty adjusting to her life without her husband and eventually sought professional help from a psychiatrist. Plaintiff testified that she still misses her husband's love and companionship, though she has recovered from the severe depression which she experienced immediately following his death.
Assessing damages for these latter factors it is also important to consider that Mr. Bergmann's life expectancy was 31.46 years at the time of his death and that he would have retired at age 65. At his income level, he would have done well to subsist on his social security and retirement income after age 65.
Officer Bergmann's yearly income at the time of his death was $5,000.00. He might have reasonably expected to earn a total of *452 approximately $90,000.00 during the eighteen year period before he retired. This Court finds it reasonable that he would consume two-thirds of that amount for his own personal living expenses. The loss of love, companionship, and consortium are not easily susceptible to arithmetical certainty.
The Court concludes that $30,000.00 would be reasonable compensation for these items as well as the loss of services and income to the Bergmann household.
IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that plaintiff take judgment against the defendant for medical expenses of $36,077.91, funeral expenses of $3,000.00, and $30,000.00 for other damages heretofore set out.