**Thomas S. LEONHARD, Appellant,**

v.

**John MITCHELL, Attorney General of the United States, et al., Appellees.**

No. 263, Docket 72–1828.

United States Court of Appeals, Second Circuit.

Argued Jan. 4, 1973.

Decided Feb. 7, 1973.

**710**

Salvatore R. Martoche, Buffalo, N.Y. (Martoche & Collesano, Buffalo, N. Y., on the brief), for appellant.

David E. Flieri, Asst. U. S. Atty. (John T. Elfvin, U. S. Atty. for Western District of New York, on the brief), for appellees.

Before FRIENDLY, Chief Judge, KAUFMAN, Circuit Judge, and HOLDEN,* District Judge.

IRVING R. KAUFMAN, ·Circuit Judge.

This appeal from an order granting summary judgment against the plaintiff, Thomas Leonhard, in an action seeking a writ of mandamus, is set in a factual context so extraordinary as to require somewhat extended discussion.

In essence, Leonhard has asked a federal court to compel officials in the United States Department of Justice to tell him where he may find his children —Michael, age eleven; Karen, age ten; and Stephan, age eight—whose current location and identity are known only to a handful of people. These are Rochelle Calabrese (whom we refer to, for convenience, as Rochelle), Leonhard's former wife and the mother· of his children; Pascal Calabrese, Rochelle's present husband; the children; and Thomas Kennelly, a former assistant in the Department of Justice who was then in charge of its Buffalo Strike Force for Organized Crime, and is now in private practice as an attorney in Washington, D. C. Although Leonhard has been granted custody of his children by virtue of an order of the New York State Supreme Court, he has been unable to secure enforcement of that right. Since the Calabreses are unwilling to reveal their present identity, Leonhard, in understandable frustration, has turned to the courts for assistance. The rather bizarre chain of events which has led to the current impasse we describe below.

I.

In December, 1965, Rochelle Leonhard instituted divorce proceedings against Thomas .Leonhard in New York State Supreme Court. The court entered a decree of divorce on December 27, 1966, awarding custody of the Leonhards's three children to Rochelle with visitation rights to Thomas.

Early in 1967, Rochelle married Pascal Calabrese and she and the children thereafter resided with him in Buffalo. Shortly after their marriage, however,

---

* Chief Judge of the District Court for the District of Vermont, sitting by designation.

Pascal, having been convicted of robbery, began serving a five year term of imprisonment in a New York state prison. Pascal's background apparently included more than routine criminal involvements, for in June, 1967, Detective Salvatore Giambrone of the Buffalo Police Department told members of the Buffalo Strike Force that Pascal might have information concerning organized crime activities in the Buffalo area. Members of the Strike Force, after interviewing Pascal, concluded that his knowledge would be most useful in their efforts to prosecute underworld mobsters.

Pascal, however, feared that his life and the lives of his new wife and her children would be endangered if he testified. In fact, according to reliable information later received from unidentified sources by the Buffalo Strike Force, a "contract" had gone out for the murder of Calabrese and his family. Justifiably apprehensive, Pascal decided to condition his willingness to testify on a promise by Strike Force officials to protect him and his family, and ultimately to relocate them in a new community with new identities. The Strike Force officials agreed, and immediately arranged Pascal's transfer from a state to a federal prison and moved Rochelle and the three children to a military reservation.

After these interim precautions had been taken, federal officials obtained indictments against Frederico Randaccio and other members of the organized crime syndicate in Buffalo. Pascal testified as a government witness at that trial, which led to a conviction in November, 1967, for conspiracy to obstruct commerce by robbery and to transport stolen property in interstate commerce. The defendants were sentenced to prison for terms ranging between ten and twenty years.

In February, 1968, as a result of his cooperation with the Strike Force, Pascal was paroled by the New York State Parole Board. Thomas Kennelly, whom we have already identified as the Attorney in Charge of the Buffalo Strike Force, arranged for Pascal, Rochelle, and the children to be moved to a new and secret residence. Under Kennelly's direction, the government provided new identities and supporting credentials for the entire family and secured employment for Pascal. On their own initiative, the family later relocated a second time, leaving Kennelly, who left his government position in August, 1971, as the only individual with knowledge of the Calabrese family's present identity and location. Kennelly continues to act as an intermediary for the Calabreses, forwarding correspondence to and from them from time to time.

Sometime during mid-1969, Thomas Leonhard's attorney contacted Kennelly and informed him of his client's desire to see the three Leonhard children. Kennelly refused to reveal their whereabouts and offered only to forward letters from the appellant to his former wife. Some correspondence was exchanged by them in this manner, but Rochelle unequivocally stated that under no circumstances would she permit Leonhard to see the children, even at a neutral location, for fear they might reveal their present identities.

Unsuccessful in his correspondence with Rochelle, Leonhard commenced an action in the New York Supreme Court seeking to modify the December, 1966, divorce decree by granting him exclusive custody of the children. Since he had no knowledge of Rochelle's address, Leonhard's attorney served a copy of the pleadings on Kennelly. Kennelly promptly returned the pleadings to Martoche, specifically advising him that he did not act as Rochelle's attorney and that he could not accept service of legal process for her. The Calabreses soon learned of the pending action and promptly informed Kennelly that if he disclosed their present residence, they would move again, this time, however, without advising him of their new location. Not unexpectedly, an order was

entered on June 18, 1971 in the Supreme Court, noting Rochelle's failure to appear to contest the custody action and awarding custody of the three children to Thomas Leonhard.

■■ Approximately one month later, on July 29, 1971, appellant began the instant action in the United States District Court. His complaint, as amended on January 12, 1972, alleged the foregoing facts and requested mandamus relief to compel disclosure of the location and new identities of his children. Leonhard asserted that the secretive relocation of his children violated his constitutional rights as well as the New York Supreme Court's custody order. The defendants,[1] claiming the action was barred by sovereign immunity, moved to dismiss the complaint for lack of subject matter jurisdiction, Rule 12(b)(1), F.R. Civ.P. In the alternative, they moved to dismiss for failure to state a claim upon which relief could be granted, Rule 12(b)(6), F.R.Civ.P., and for summary judgment, Rule 56, F.R.Civ.P. Judge

Henderson, after concluding that the doctrine of sovereign immunity did not bar the action,[2] held that only "[w]hen a clear-cut duty is imposed by law" does a district court have the power under 28 U.S.C. § 1361 to compel an officer or employee of the United States to perform that duty. Since he determined that on the facts presented to him, none of the defendants owed such a duty to Leonhard, the district judge granted the defendants' motion for summary judgment. This appeal followed.

## II.

■ Our sole task on this appeal is to gauge the scope of authority granted to district courts under 28 U.S.C. § 1361. This section, enacted in 1962, provides that "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."[3] Traditional teaching views a writ of mandamus as appropri-

---

1. In addition to Kennelly, the defendants were John Mitchell, then Attorney General of the United States; the Assistant Attorney General, Criminal Division, Department of Justice; the Chief of the Organized Crime and Racketeering Section, Criminal Division, Department of Justice; and the Chief of the Buffalo Field Office, Organized Crime and Racketeering Section, Criminal Division, Department of Justice.

2. The defendants reargue on appeal that the doctrine of sovereign immunity bars the action because it is one brought against the government. But "[s]overeign immunity is no bar . . . [where] the complaint alleges that agents of the Government have exceeded their constitutional authority while purporting to act in the name of the sovereign." Berk v. Laird, 429 F.2d 302, 306 (2d Cir. 1970). See Dugan v. Rank, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 689–691, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Since Leonhard's complaint alleged that the defendants' participation in the secretion of his children abridged rights secured to him by the Fifth Amendment, the action did not improperly name these defendants.

3. Of course, even before enactment of § 1361, federal courts had the power to issue writs of mandamus under the "All Writs" section, 28 U.S.C. § 1651, which provides that federal courts "may issue all writs necessary or appropriate in aid of their . . . jurisdictions . . . ." But prior to 1962, only the District Court for the District of Columbia was vested with *original* mandamus jurisdiction. *See* M'Intire v. Wood, 11 U.S. (7 Cranch) 504, 3 L.Ed. 420 (1813); Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838). Persons seeking judicial review of federal administrative action who could not assert an independent basis for jurisdiction—such as 28 U.S.C. § 1331 (general federal question jurisdiction)—were required to travel to the Nation's capitol to seek relief. *See* Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L.Rev. 308, 308–313 (1967). Enactment of § 1361 was "not intended to expand either the availability or scope of judicial review of federal administrative action." *Id.* 319.

ate solely "to compel officials to comply with the law when no judgment [or discretion] is involved in that compliance." Note, Developments in the Law: Remedies Against the United States and its Officials, 70 Harv.L.Rev. 827, 849 (1957). Thus, a writ of mandamus properly is issued when a government official fails to comply with a specific statutory or regulatory direction. *See, e. g.,* Feliciano v. Laird, 426 F.2d 424 (2d Cir. 1970) (Army failed to process application for hardship discharge in accordance with regulations). Additionally, decisions construing § 1361 have held that "official conduct may have gone so far beyond any rational exercise of discretion as to call for mandamus even when the action is within the letter of the authority granted." United States ex rel. Schonbrun v. Commanding Officer, Armed Forces, 403 F.2d 371, 374 (2d Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969). *See* Casarino v. United States, 431 F.2d 775 (2d Cir. 1970); Safir v. Gibson, 417 F.2d 972 (2d Cir. 1969), cert. denied, 400 U.S. 850, 91 S.Ct. 57, 27 L.Ed.2d 88 (1970); Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965). Accordingly, a request for relief under § 1361 requires "the court [to] utilize all relevant legislative and other materials to determine the scope of discretion or power delegated to the officer." Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308, 354 (1967).

It remains undisputed, however, that § 1361 only creates a means of enforcing a duty owed to one by a government official. To establish that duty, the appellant relies solely on the Due Process Clause of the Fifth Amendment, citing Meyer v. Nebraska, 262 U.S. 390, 43 S. Ct. 625, 67 L.Ed. 1042 (1923) (statute making illegal the teaching of any language except English in Elementary grades held a denial of due process). There, the Supreme Court, in construing identical language in the Fourteenth Amendment, stated:

> While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual . . . to marry, establish a home and bring up children. . . . The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect.

262 U.S. at 399–400, 43 S.Ct. at 626–627. According to Leonhard, "it is clear that, as the 'Due Process Clause' of the Fourteenth Amendment protects the liberty of parents to raise their children as they see fit [free] from State interference, the 'Due Process Clause' of the Fifth Amendment protects that liberty from Federal Interference."

This contention, however, goes too far, for it is beyond dispute that the state has a substantial range of authority to protect the welfare of children. *See, e. g.,* Prince v. Massachusetts, 321 U.S. 158, 166–167, 64 S.Ct. 438, 88 L.Ed. 645 (1944). This power extends to the determination of parental custody and visitation rights. *See, e. g.,* N. Y. Domestic Relations Law § 70 (McKinney's Consol.Laws, c. 14, 1964).

In the absence of a clear constitutional right to custody or visitation rights, we must focus on the circumstances surrounding Kennelly's refusal to disclose to Thomas Leonhard the location and identity of his children. If his refusal is a "rational exercise of discretion," mandamus is inappropriate. A review of the facts reveals that Kennelly arranged to secrete Rochelle and the children at the specific request of Pascal

Calabrese.[4] At that time—February, 1968—Rochelle had legal custody of the children and believed that their safety from threatened violence required that they no longer be visited by their natural father. Information received by Strike Force officials concerning a "murder contract" placed on the heads of the Calabreses confirmed their initial fears. Kennelly's present refusal to disclose the location of Calabrese family is grounded in his sense of obligation to them, both because of his agreement never to disclose their location and of his continued belief that the lives of the children and Rochelle and Pascal would be endangered if this information should become known. In view of the circumstances, we could hardly dismiss this latter fear as groundless or irrational.

In sum, the extraordinary factual posture of this case indicates that Kennelly, rather than having abused a discretionary power which he held, acted in good faith in attempting to balance two competing interests: Thomas Leonhard's natural wish to be reunited with his children, and Rochelle Calabrese's equally natural desire to protect the children from serious harm or even death.[5] Having found no violation of statutory or constitutional rights, we need not attempt to indicate how we might have resolved this difficult problem were it presented to us in the first instance. Leonhard is free, of course, to pursue enforcement of New York's custody order in the courts of that state. His personal unhappiness and frustration, which we recognize, do not however, permit a federal court to issue a mandamus order where jurisdiction for such an order does not exist, even in a case with such sad undercurrents, the solution of which calls for the wisdom of Solomon. Accordingly, the judgment below is affirmed.

---

4. Although Kennelly did not act pursuant to a specific authorizing statute—a fact we do not find material in this case—we note that Congress codified such procedures in the Organized Crime Control Act of 1970, § 502, Pub.L. 91–452, 84 Stat. 922, 933 (Oct. 15, 1970):

> The Attorney General of the United States is authorized to . . . offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity . . . .

5. In light of this conclusion, we need not consider whether Kennelly, because he no longer is an officer or employee of the Federal government, is beyond the jurisdiction of § 1361, even though the duty sought to be enforced flows from his former service in the Justice Department. Moreover, if, contrary to Kennelly's representations, any other defendants know the location or identity of the Calabrese family, they too could refuse to disclose this information for the reasons we have set forth.