Leona BERGMANN, Appellee,

v.

UNITED STATES of America,
Appellant.

No. 81–2254.

United States Court of Appeals,
Eighth Circuit.

Submitted May 20, 1982.

Decided Oct. 6, 1982.

Michael W. Newport, St. Louis, Mo., for appellee.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., Thomas E. Dittmeier, U. S. Atty., St. Louis, Mo., Anthony J. Steinmeyer, Marleigh D. Dover, Attys., Dept. of Justice, Civ. Div., Washington, D. C., for appellant.

Before ROSS, McMILLIAN and JOHN R. GIBSON, Circuit Judges.

ROSS, Circuit Judge.

Leona Bergmann instituted this wrongful death action under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. (FTCA) alleging that the government's negligent selection and supervision of Benjamin Rosado a/k/a Benjamin Russo, as a federally protected witness resulted in the murder of her husband, police officer Fred B. Bergmann, by Rosado. The district court, 526 F.Supp. 443,[1] found that the government's negligent selection and supervision of Rosado under the Federal Witness Security Program was a substantial factor in the death of Mr. Bergmann and awarded Mrs. Bergmann $69,077.91 in damages. We reverse.

On June 17, 1976, Benjamin Rosado became a protected witness after agreeing to testify against organized crime figures in New York City relating to the murder of a government drug informant. Rosado had been present when the informant had been beaten and shot to death. Protection for Rosado was requested by Assistant United States Attorney, John P. Cooney. The request for protection was approved by various Department of Justice officials. The United States Marshals Service then assumed the task of protecting Rosado and his family.

On July 21, 1976, Rosado and his family were relocated to St. Charles, Missouri, and their name was legally changed to Russo. The marshals service arranged for rental of an auto, an apartment, placement of one of the Rosado children in school and credit with service companies.

On September 12, 1976, Fred Bergmann, an auxiliary police officer for the City of St. Charles, responded with other officers to a reported burglary at the St. Charles gas company. Officer Bergmann was shot by the burglar upon entering the gas company's offices. Officer Bergmann lived for a few weeks after the shooting and then died of complications.

In May 1977, Benjamin Rosado was implicated in the Bergmann murder. In April 1978, Rosado was convicted in state court of the murder of officer Bergmann and sentenced to life imprisonment.

The district court held that the government had negligently selected Rosado for the witness protection program in that Rosado's criminal history, including repeated imprisonments for robbery, created a foreseeable risk of harm to officer Bergmann. The court also concluded that

> by permitting Rosado to participate in the witness protection program, the government created a special relationship which required the government to exercise reasonable care to control Rosado. Although the government had special facts within its knowledge concerning Rosado's criminal propensities, the government relocated Rosado from New York City to St. Charles, Missouri, with a new identity but without taking measures to prevent Rosado from engaging in the criminal activities which resulted in the murder of plaintiff's husband.

The district court found that the government, specifically the marshals service, negligently supervised Rosado in the program by failing to set up any job interviews for Rosado during the time he was relocated

1. The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri.

and by failing to contact Rosado from August 1976 until October 22, 1976.[2] The district court concluded that the lack of supervision by the government of Rosado's participation in the program was a substantial factor in officer Bergmann's death.

The district court also rejected the government's claim that the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a) applied to decisions regarding the selection and supervision of protected witnesses. The court found that although the formulation of policy on how to select and supervise protected witnesses could not support liability, here, neither the United States attorney in requesting protection nor the marshal in supervising Rosado were formulating policy.

## I. Discretionary Function

The discretionary function exception to the FTCA excludes from the waiver of sovereign immunity:[3]

(a) Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

This court has in the past used the planning or policy level versus operational level distinction in evaluating whether the government was involved in a discretionary function. *See Gross v. United States,* 676 F.2d 295, 302 (8th Cir. 1982); *Madison v.*

*United States,* 679 F.2d 736, 739 (8th Cir. 1982). This distinction is derived from the Supreme Court's evaluation of the discretionary function exception in *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) and *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). However, as noted in *Gross v. United States, supra,* 676 F.2d at 303 n.19, other circuits have applied the discretionary function exception "only to decisions in which the decisionmaker must look to considerations of public policy."

In this case, the district court in rejecting the government's claim that the discretionary function exception applied relied upon *Liuzzo v. United States,* 508 F.Supp. 923 (E.D.Mich.1981). In *Liuzzo,* the district court denied the government's motion to dismiss for failure to state a claim. The court held that the decisions of the FBI agent regarding the recruitment, training and supervision of an FBI informant, and the authorization by the agent for the informant's participation in a specific mission were not decisions within the discretionary function exception. *Id.* at 932. A key factor in the *Liuzzo* opinion was the fact that the FBI agent in question "was operating under FBI policy on the recruitment and supervision of racial and criminal informants." *Id.* at 932 (footnote omitted). In *Liuzzo,* the court held "that claims which arise out of the manner in which a particular situation is handled, and which are based on allegations that existing, valid regulations were wrongfully or negligently implemented are not so barred." *Id.* at 931.

---

**2.** The district court noted that the marshals service activity record indicated that Rosado was contacted six times during June and July 1976. However, other records indicate that the Rosados did not arrive in the St. Charles area until July 21, 1976. The only notation in the marshals service records after this date and before the Bergmann murder is a note concerning mailing of medical records on July 30, 1976.

The United States marshal who had direct contact with Rosado in St. Charles and assisted him in receiving credit, a car and an apartment in St. Charles, testified that he attempted to contact protected witnesses about once a week but he was sure that there were some weeks he did not see Rosado. This same marshal identified the activity report as probably headquar-

ter's record and not his own. Thus, the only evidence in the record concerning the number of contacts made by the marshal after Rosado was relocated is the marshal's own testimony as to the numbers of contacts he made. At any rate, it is difficult to understand how more frequent contacts would have kept Rosado from engaging in criminal activity if he decided to do so.

**3.** State immunity rules concerning prosecutors and law officers are inapplicable in an FTCA suit, rather the matter is one to be decided under the discretionary function exception. *See United States v. Muniz,* 374 U.S. 150, 164, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963).

■ This court has also found the discretionary function exception inapplicable to allegations that government employees ignored or failed to comply with regulations or policies designed to guide their actions in the particular situation. *See Madison v. United States,* 679 F.2d 736 (8th Cir. 1982) (enforcing compliance with safety regulations); *Gross v. United States, supra,* 676 F.2d at 302 (consistent reversal of local official's decisions by higher authorities and ignoring directives of supervisors); *Loge v. United States,* 662 F.2d 1268 (8th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982) (failure to require mandatory tests of vaccine as provided for in regulations). Of course, the plaintiff having identified a nondiscretionary function or duty must go on to show that the acts or omissions of government employees constitute tortious conduct under state law. 28 U.S.C. § 1346(b).

■ On the other hand, regulations or policies may, in fact, vest certain employees or officials with the discretion to make a judgment in a particular situation. An example of this type of policy was considered in the recent case of *Payton v. United States,* 679 F.2d 475 (5th Cir. 1982) (en banc). In *Payton,* the court held that the former federal parole statute specifically describes the decision of whether to parole a prisoner and the terms of that parole as a discretionary decision and the discretionary function exception therefore applied. At 480–82. In *Payton,* the plaintiff alleged, *inter alia,* that a specific prisoner had been negligently released on parole and the parole board had negligently failed to make adequate provisions for the continued treatment and supervision of the parolee. *Id.* at 480–82.

In the present case, the district court held that the government was not "formulating policy" when Rosado was selected for and supervised in the Witness Security Program. The court noted that the decisions of Justice Department officials and the U.S. Marshals Service regarding Rosado were "responses to a particular situation" and the officials "operated under the Department of Justice policy for supervising protected witnesses." These same general comments could very well have also been made about the decision in *Payton* of whether to grant parole and the terms of parole. We turn, therefore, to the statute and policy which govern the Witness Security Program.

## II. Selection

The statutory authorization for the Witness Security Program is contained in Sections 501 to 504 of Title V of the Organized Crime Control Act, Pub.L. 91–452 (pres. 18 U.S.C. § 3481) and it provides:

Sec. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.

Sec. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities *and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy.* Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.

Sec. 503. As used in this title, "Government" means the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States,

any political subdivision, or any department, agency, or instrumentality thereof. The offer of facilities to witnesses may be conditioned by the Attorney General upon reimbursement in whole or in part to the United States by any State or any political subdivision, or any department, agency, or instrumentality thereof of the cost of maintaining and protecting such witnesses.

Sec. 504. There is hereby authorized to be appropriated from time to time such funds as are necessary to carry out the provisions of this title.

This statute read in its entirety is more an authorization of funding than a statute limiting or guiding discretionary decisions. To the extent that it does limit discretion, it requires that the witness be one who will testify against a participant in organized crime. Whether or not the witness or his family is in danger is a judgment clearly committed to the discretion of the Attorney General.

The Justice Department policy regarding witness protection in effect when Rosado was put into the program, OBD 2110.2 (January 10, 1975), provides for only one additional selection criteria beyond that stated in the statute. That condition of selection is that the "[e]vidence in possession indicates it would be advantageous to the Federal interest for the Department to protect the witness and/or a family or household member." Determining whether protection of the witness is advantageous to the federal interest rather obviously calls for a policy decision of the discretionary nature.

The only "policy" the statute and OBD 2110.2 establish for the selection of a person for protection is a policy calling for judgments to be made regarding the threat to the witness and the federal interest advanced by the protection. The assistant U. S. attorney who requested protection for Rosado, and later officers of the Department of Justice, did make these judgments. As the assistant U. S. attorney testified:

A. I think I said on my direct examination that the two primary considerations were, you know, how important the case was that the witness was going to testify in and the threat to the witness' safety. You had important cases where the witnesses could testify without putting their lives in danger. The Rosado case was not like that. The prospective case that he was going to testify in was very important because we took the shooting or the murder of an informant very seriously. It was a very important case. And, given the nature of the people who were going to be defendants in that case, we felt that there was a distinct threat on Rosado's life.

Other courts have noted the broad discretion vested in the Attorney General under the Witness Security Program. *See Garcia v. United States,* 666 F.2d 960, 963 (5th Cir. 1982); *Doe v. Civiletti,* 635 F.2d 88, 97 (2d Cir. 1980). Additionally, the Second Circuit in *Leonhard v. United States,* 633 F.2d 599, 614 (2d Cir. 1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981) recognized the reasons for the actions of government officials in protecting witnesses "strongly implicate federal interests" regarding "efforts to deal with a very serious problem, organized crime * * *."

The district court, in finding the discretionary function exception did not apply in this case, noted that plaintiff did not challenge the policy that "permits criminals to participate in the program."[4] However, the district court held that it was "Rosado's criminal propensities" which caused the selection of Rosado for a program which normally relocates the witness and his family and gives him a new identity, to be negligent.

▊ We must disagree with the district court. There is no policy which calls for consideration of the witness' criminal record nor a policy for evaluating "how" criminal the witness has been in the past. We believe those considerations must remain ones to be considered in writing the regulations

---

4. There is no written policy which "permits" criminals to participate in the program, rather the statute and OBD 2110.2 are silent on the matter.

and in the absence of such inclusion in the regulations, then to be evaluated within the discretionary decision of whether to use a particular person as a witness and place that person in the program.

Considering the lack of guidance or standards imposed by the statute and policy which governs the Witness Security Program, we believe that the selection of a person for the program is a planning or policy level decision. Although "selection" may be a response "to a particular situation," we believe that when little or no guidance is given for a response, the response, itself, may be an exercise of a discretionary function.

In *Madison v. United States, supra,* 679 F.2d at 738–39, this court held that the decision to award a government contract to a particular company to produce a highly dangerous commodity was an act done at the planning level "involving the weighing of various facts and policies." The plaintiffs in *Madison* did not challenge the decision to produce the highly dangerous commodity but rather the decision to give the contract for production to a specific company. This decision could also have been easily characterized as a "response to a particular situation" but this court held the decision to be within the discretionary function exception.

Additionally, in *Gross v. United States, supra,* 676 F.2d at 303, this court distinguished numerous cases cited by the government supporting application of the discretionary function exception on the grounds that in those cases "no objective standard governed the exercise of discretion by the Government official." Although the court in *Gross* found the actions of members of a county Agricultural Stabilization and Conservation Service Committee "sufficiently capable of measurement by objective standard," we do not believe an objective standard can be applied in this case. We simply do not believe the courts are equipped to judge or should be allowed to

review a prosecutor's judgment in matters uniquely related to his professional function as in this case. *See Smith v. United States,* 375 F.2d 243 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967). The selection of a witness for the program is, in our view, interrelated to decisions on the importance of the case, the necessity of using a particular person as a witness, and the threat to the witness' life. These decisions in turn each require consideration of numerous facts and policies of the Department of Justice. As the court in *Smith v. United States, supra,* stated "prosecutorial discretion has long been recognized as sacrosanct * * * [t]he judgment of the Department of Justice is an important aspect of governmental policy * * *." *Id.* at 248.

While it may be offensive to many to have the government using and protecting witnesses whose criminal record is disgustingly lengthy, it is a policy judgment to do so. We do not take lightly Mrs. Bergmann's loss, but we also respect the serious policy decisions which must be made in determining how best to wage war on organized crime.[5]

### III. Supervision

Having found the selection of Rosado for the program to be a decision within the discretionary function exception of the FTCA, we now review the district court's findings that the marshals service was negligent in its supervision of Rosado.

The Attorney General has delegated his authority to offer to provide "for the health, safety, and welfare of Government witnesses and their families" to the United States Marshals Service. 28 C.F.R. § 0.111(c). Justice Department policy OBD 2110.2 provides:

*PROTECTED SERVICES.* The U. S. Marshals Service will be responsible for the protection and maintenance of those persons designated as protected witnesses. The Witness Security Division, U. S. Marshals Service, will supervise the pro-

---

5. The assistant United States attorney who requested protection of Rosado testified that he discussed Rosado's criminal record with him

and the necessity of staying away from crime if he wished to stay in the program and protect his new identity.

tection of witnesses and/or their family and household members.

The Witness Security Program establishes that the marshals service is responsible for supervising the protection of witnesses.[6] No provision is made in the Department of Justice policy for steps to be taken to protect the public from the witness and the inclusion of any such provision might have been outside the scope of the Witness Security Program statutes.

▪ In *Leonhard v. United States,* 633 F.2d 599, 625 (2d Cir. 1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981), the court held that the decision not to continue to support a protected witness and his family and not to conduct minute supervision over their lives were matters within the discretionary function exception of the FTCA. We agree.

The distinction which must be made is that while the government assumed a duty to use due care in protecting Rosado, the policy of the Department of Justice is that the normal way protection is provided for unincarcerated witnesses is through relocation. There are no doubt other ways for the government to protect witnesses, but we believe the decision to use relocation as the primary method was a planning or policy level decision within the discretionary function exception. The government may have assumed a duty to protect the witness but how best to fulfill this duty is a matter of discretion. *Redmond v. United States,* 518 F.2d 811 (7th Cir. 1975); *United States v. Faneca,* 332 F.2d 872, 875 (5th Cir. 1964), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1964).

The government also argues that constant supervision of the relocated witness has never been utilized in the program and, in fact, is inconsistent with the purpose of relocation which is to give the witness anonymity. We agree with the government. Relocation does not allow for control. As the assistant United States attorney who requested protection for Rosado stated:

My understanding of the role of the Marshal Service in the Witness Protection Program is to protect the witness and not—as I say, it is not a question of monitoring people. What I understood to be the situation, if you had a person who was not in custody, you had—the Marshals' role, basically, was to find a place for them to live, get them a new identity, get them started, support them with some income, and then I understood that at a certain point that income terminates and those people were on their own. But those people were—the Marshals don't live with these people out there. They basically find them a place to live and the people are on their own. It's [not] as if you have Marshals hanging out at the home or something like that. They just get them set up and leave them alone and then if there's a protective problem, the Marshals are there.

\* \* \* \* \* \*

The sad fact of the matter is that the premium in relocation is that nobody, not the Assistants here, not the Agents with whom these people normally work, that nobody but the Witness Protection Authority people themselves know where these people are, and that goes for local authorities and local prosecutors or anybody.

The whole point of the system is to find these people a new name and a new location where they can start over without being pointed to out in the street as being a hot witness for the Government. That's really what it's all about.

▪ As indicated, *supra* at 792, the plaintiff, even if he is successful in identifying a nondiscretionary function or duty, must go on to show that the acts or omissions of government employees constitute tortious conduct under state law. That requirement was not met in this case.

In *Irby v. St. Louis County Cab Co.,* 560 S.W.2d 392, 394 (Mo.App.1977) the Missouri court held that actionable negligence must

---

**6.** *See Swanner v. United States,* 275 F.Supp. 1007 (M.D.Ala.1967), *rev'd on other grounds,* 406 F.2d 716 (5th Cir. 1969), *on remand,* 309 F.Supp. 1183 (M.D.Ala.1970).

show the "existence of a duty on the part of the defendant to protect plaintiff from injury." In *Scheibel v. Hillis*, 531 S.W.2d 285 (Mo.1976) (en banc) the court found plaintiff had stated a cause of action by alleging that defendant had left a loaded shotgun in her home, advised a person with dangerous propensities of its presence in her home, and the third person had shot plaintiff in defendant's home with the gun. The court in *Scheibel v. Hillis* had very little trouble in finding a duty owed to plaintiff by defendant because defendant was an owner-occupier of the land. The Restatement (Second) of Torts § 315 states that unless there is a special relationship between the actor and the person who causes the harm there is no duty to control that person's conduct. Such relationships include parent-child, master-servant, possessor of land or chattels-licensee. Restatement (Second) of Torts §§ 316–18. And if one "takes charge" of a person having dangerous propensities he is under a duty to control that person's conduct. Restatement (Second) of Torts § 319. In this case, there is no duty which could arise for the government to control Rosado because there was no relationship requiring the government to "take charge" of Rosado. We should also note that in the absence of a statute, there is no legally enforceable duty on the part of the government to warn or to compensate victims of criminal activity. *Redmond v. United States, supra,* 518 F.2d at 816.

While it is not necessary to our decision we wish to comment on other legal and factual findings of the district court.

The district court found that Rosado had been negligently supervised by the marshals service failing to contact him from August until late October 1976. As we have noted, *supra* at footnote 2, we do not believe the evidence supports this finding. In any event, the district court also found that there were no regulations of the marshals service which called for monitoring the activities of a protected witness on a 24-hour basis. Nor are there any regulations which specify the number of contacts a marshal should make with a relocated witness.

The district court also found the marshals service had violated OBD 2110.2 by failing to set up any job interviews for Rosado. However, the policy states:

*MAINTENANCE SERVICES.* The U. S. Marshals Service will have sole authority to arrange for the maintenance of those persons designated as protected witnesses and their family and/or household members. Maintenance expenses are payable from the appropriation "Fees and Expenses of Witnesses." The Witness Support Section, U. S. Marshals Service, will supervise the administration of maintenance activities.

Acquisition of gainful employment within 120 days of acceptance into the program is the responsibility of the protected witness. Job assistance, when necessary, will be provided by the Witness Security Division of the U. S. Marshals Service, but will be limited to assisting the protected person in locating one reasonable job opportunity. If this job is refused, maintenance may be terminated immediately. If a reasonable job opportunity cannot be developed within 60 days following the last court appearance, maintenance may be terminated.

While the marshals service concedes that it had not attempted to find Rosado a job at the time of Bergmann's murder, the service also emphasizes that Rosado had not testified yet in the case involving the murder of the drug informant and the crime happened a very short time after Rosado moved to St. Charles. The marshals service argues that it is not normally feasible to develop employment for a witness who will in the future need to be away from the job for unknown periods of time. More importantly, exhibits support the marshals service's representation that Rosado and his family were receiving close to $1000 a month in maintenance payments at the time of the Bergmann murder. Thus, we do not believe that the evidence supports a finding that the marshals service should have been seeking job interviews for Rosado at the time he murdered officer Bergmann. Considering the support payments

made to Rosado, it is questionable whether the lack of a job was a substantial factor in the death of officer Bergmann.

We also wish to make some comments regarding the district court's finding that the actions of the government created "a risk" to officer Bergmann. Although Rosado, in view of his criminal record, was "a risk," he was not "a risk" which an act or omission of the government created. The question properly framed is whether the act of placing Rosado in the program and relocating him with a new identity increased the risk that Rosado would harm another person to a degree which was unreasonable. See Restatement (Second) of Torts §§ 302B and 303 (1965). In determining whether the risk is unreasonable and thus the act is negligent, a court should consider the utility of the act done or the particular manner in which it is done. See Restatement (Second) of Torts § 291. In this case, relocation may have on one hand increased the chance Rosado would return to crime, in that he had a new identity and local police were not aware of his true identity. But, balanced against any increase in risk must be the government's consideration that Rosado had become a government witness, would be receiving maintenance payments and if he returned to crime he would risk both his life and that of his family. After this balancing of possible increase and decrease in the chance Rosado might return to crime, the court would have to consider the utility of the government's conduct in using Rosado as a witness against organized crime which led to the need to protect him and relocate him. See Restatement (Second) of Torts § 292.

In conclusion, we find that the plain and simple fact is that the witness protection statutes contemplate only the protection of witnesses and their families—not protection of the public from the witness. We hold that the selection and relocation of Rosado were within the discretionary function exception of the FTCA and the conduct of the marshals service was not negligent because there was not a legal duty to control Rosado. Additionally, we do not be-

lieve the evidence supports a finding that the actions of the marshals service created an unreasonable risk of harm or were substantial factors in the death of officer Bergmann. Reversed.