Michael RUFFALO, Jr., by his mother and next friend, Donna RUFFALO; and Donna Ruffalo, Appellants,

v.

Benjamin CIVILETTI; William E. Hall; Emmitt Fairfax; Michael Ruffalo, Sr.; the United States Department of Justice; the United States Marshals Service; and the United States of America, Appellees.

Nos. 82–1779, 82–1893.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1983.

Decided March 17, 1983.

Rehearing and Rehearing En Banc Denied June 8, 1983.

Opinion following remand, 565 F.Supp. 34.

Robert G. Ulrich, U.S. Atty., Mark J. Zimmermann, Asst. U.S. Atty., Kansas City, Mo., for appellees.

George E. Kapke, Cochran, Kramer, Kapke & Willerth, Independence, Mo., for Michael Ruffalo, Sr.

George Kannar, Jack Novik, Marcia Robinson Lowry, American Civil Liberties Union, New York City, Sanford P. Krigel, Krigel & Krigel, Kansas City, Mo., for appellants.

Before BRIGHT, ARNOLD and JOHN R. GIBSON, Circuit Judges.

ARNOLD, Circuit Judge.

Donna Ruffalo appeals from the denial of her motion for partial summary judgment, by which she sought the return of her child, who has been relocated by the federal government under the federal Witness Protection Program. The District Court[1] held that Donna's relationship with her child is constitutionally protected but denied her motion for summary judgment largely because it felt that genuine issues of fact remained to be tried with respect to the government's responsibility for the continued separation of mother and child. We agree with the District Court that the parent-child relationship, in the circumstances of this case, is part of the "liberty" protected by the Due Process Clause of the Fifth Amendment. We disagree with the grounds stated for the denial of the motion for summary judgment, but we nevertheless conclude, for other reasons shortly to be explained, that it was not error to refuse immediate injunctive relief commanding the return of the child. The orders denying summary judgment will therefore be affirmed. We hold, however, that Donna has made out a strong prima facie entitlement to some form of equitable relief, and we remand for further proceedings to determine what relief, if any, to grant.

I.

Michael Ruffalo, Jr. (Mike), was born on September 7, 1969, to Donna and Michael Ruffalo, Sr. Donna obtained a divorce by default in the Circuit Court of Jackson County, Missouri, from Michael on March 20, 1972, and she was awarded custody of Mike.[2] Three years later, Donna and Michael entered into an "Informal Letter Agreement Re Possession of Child," which provided that Donna would have "custody" of Mike, while Michael would have "possession."[3] The terms of this agreement were incorporated into a second custody order, which was entered on March 19, 1975. Thereafter, Mike lived with his father, and although the parties disagree about how much time Mike spent with his mother, she saw him at least occasionally, and she exercised some degree of parental control by enrolling him in school.

During this time, Michael was a secret informer for the FBI, which was investigating organized crime in Kansas City, Missouri. In late October and early November 1978 federal officials received information that Michael's life was in danger. Michael asked the FBI for protection, and on November 16, 1978, both Michael and the nine-year-old Mike were taken into the federal Witness Protection Program.[4] Donna has

1. The Hon. Howard F. Sachs, United States District Judge for the Western District of Missouri.

2. Michael was ordered to pay child support and was awarded reasonable visitation rights.

3. The agreement provided:
   1. That DONNA RUFFALO shall keep and maintain custody of the child MICHAEL RUFFALO in accordance with the default decree heretofore granted.
   2. It is further agreed that MICHAEL J RUFFALO shall keep and maintain possession of said minor child MICHAEL RUFFALO, and that no change of said possession of this child shall be made without mutual agreement of the parties or by further order of the Court in this respect.

3. The father MICHAEL J RUFFALO shall continue to furnish the support for the child by provising [sic] the same in kind for the child.
   4. The mother DONNA RUFFALO shall be entitled to the possession of the child without further order of the Court, on Sunday or Saturday of each week; and they will alternate possession on important holidays ... and other wise [sic] reasonable visitation right [sic] to DONNA.
   Designated Record (D.R.) 21.

4. The federal Witness Protection Program was authorized by Title V of the Organized Crime Control Act of 1970, P.L. 91–452, §§ 501–504 (reprinted preceding 18 U.S.C. § 3481 (1976)). It is administered by the United States Marshals Service.

not seen or talked with her son, who is now thirteen years old, since. She learned of her son's relocation only after the fact.

At government expense, new identities were created for father and son. Federal officials moved them to a secret location and gave them new names, new social security numbers, and a temporary residence. In addition, they provided Mike with new school records so that he could be admitted to school without having to produce records from his former school which would reveal his true identity. At no time did the government provide Donna with notice or an opportunity to be heard in opposition to the separation.

At the time that Michael and Mike went into the Witness Protection Program, the federal authorities knew that Mike was living with his father and thought that Michael had legal custody. Shortly thereafter, however, the officials learned that custody had been awarded to Donna. Donna contacted federal officials in Kansas City, seeking information about her child, and requested that Mike be returned to her. The authorities told her that her son and ex-husband were under the Witness Protection Program and that their new identities and location would not be revealed to her because disclosure would endanger Michael. The officials offered to relay messages to Michael, and on at least two occasions the federal Marshals Service, which runs the Witness Protection Program, told Michael that Donna wanted to speak on the phone with her son, but Michael refused to allow this.

Donna tried to get relief from the state court which had awarded her custody of Mike. On January 15, 1979, the Marshals Service served Michael with an Order to Show Cause and Application for Contempt Citation from the Missouri state court. Michael refused to appear. After two more orders to show cause were served, the state court, on February 14, 1979, found Michael in civil contempt of the March 19, 1975, custody order. On March 20, 1979, the state court issued a warrant of commitment, ordering that Michael be committed to the Jackson County, Missouri, jail for ninety days or until he obeyed the court's custody order. Donna then moved to modify the custody decree, and on July 24, 1979, after Michael had received notice through the Marshals Service and failed to appear, the state court modified its March 19, 1975, order, awarded "the full care, control and custody of her son" to Donna, and cancelled all Michael's visitation rights or privileges. D.R. 27. Neither the contempt citation, the warrant, nor the 1979 custody order has ever been enforced, since Michael has refused to comply, and the government has refused to divulge his whereabouts or otherwise to help enforce the state-court orders. The government employed private counsel at government expense to represent Michael in the custody dispute.

On July 23, 1980, Donna, on behalf of herself and her son, commenced this action for injunctive relief and damages by filing a complaint in the United States District Court for the Western District of Missouri against Michael and the federal officials responsible for concealing him through the Witness Protection Program. She alleged that the defendants had

> violated the Due Process Clause of the Fifth Amendment to the United States Constitution by unreasonably intruding upon Donna Ruffalo's right to family integrity and to a relationship with her son, by failing to provide Donna Ruffalo with a hearing before infringing upon her constitutionally protected liberty interests, and by interfering with and destroying Donna Ruffalo's right to enforce the order of the Circuit Court of Jackson County, Missouri.[5]

---

**5.** A like constitutional claim was made on behalf of Mike. In addition, the complaint alleged that the defendants had violated the Administrative Procedure Act, 5 U.S.C. § 706 (1976); that the federal defendants had committed various intentional torts upon the plaintiffs, there-by subjecting the United States to liability under the Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1976 & Supp. V 1981); that the defendants had violated the Freedom of Information and Privacy Acts, 5 U.S.C. §§ 552, 552a (1976 & Supp. V 1981); and that Michael had violat-

D.R. 15. Jurisdiction of this claim was alleged to be based on the existence of a federal question.[6]

The District Court severed the injunctive aspect of the suit from the damages aspect. Donna then moved for partial summary judgment, seeking an injunction for the return of Mike. Before hearing the motion, the District Court ordered a stay of proceedings so that Michael could seek a custody hearing in state court. *Ruffalo v. Civiletti,* 522 F.Supp. 778 (W.D.Mo.1981). This action was taken at Michael's own request. However, Michael then refused to appear personally in the state court and sought merely to have service of that court's previous orders quashed. When the state court ruled against Michael, the District Court once again took up Donna's motion for partial summary judgment, as well as the federal defendants' motion to dismiss or for summary judgment. *Ruffalo v. Civiletti,* 539 F.Supp. 949 (W.D.Mo.1982).

■ Although the District Court held that the complaint stated a claim for violation of Donna's constitutional rights,[7] it declined to grant her relief, reasoning that the domestic-relations exception to federal jurisdiction barred an injunction against Michael, and that summary judgment against the federal defendants was inappropriate because there was a question of fact as to whether Mike was in federal custody. The federal defendants' cross-motion to dismiss was denied.[8] Donna then filed a Motion for Partial Reconsideration of the April 30 order, this time seeking certain alternative forms of equitable relief against the federal defendants only. The District Court denied this motion on July 1, 1982, in an unreported order. Donna appeals from the denial of both her motions. We have jurisdiction because the orders appealed from are orders denying injunctions. 28 U.S.C. § 1292(a)(1).

## II.

■ The District Court held, and we agree, that Donna's relationship with her son is part of the "liberty" protected by the Due Process Clause of the Fifth Amendment. The defendants rely on *Leonhard v. Mitchell,* 473 F.2d 709 (2d Cir.), *cert. denied,* 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973). In *Leonhard* the state court had awarded custody of the children of a divorced couple to the mother and visitation rights to the father. The mother remarried, and when her new husband decided to testify for the government in a case concerning organized crime, the entire family was relocated and given new identities by federal officials. After obtaining a second state decree awarding custody to him, the father sued in federal court seeking a writ of mandamus to compel the government to divulge the whereabouts and new identities of his children. The Second Circuit held that summary judgment against the father was appropriate. The court said that there was no "clear constitutional right to custody or visitation rights," *id.* at 713, and that mandamus was inappropriate because the government official's[9] refusal to disclose to the father the whereabouts of the children was a rational exercise of his discretion, *id.* at 714. If *Leonhard* may be read to mean that a parent who has been awarded custody of his or her child has no constitutionally

ed the plaintiffs' rights under Missouri law. D.R. 15–17.

**6.** The parties later raised the issues of diversity and habeas corpus jurisdiction. In view of our decision, we need not address these issues.

**7.** The court decided that sovereign immunity was no bar to the injunctive relief sought against the institutional federal defendants, and that damages could be sought from the individual defendants, subject to a defense of qualified, good-faith immunity. 539 F.Supp. at 952–53. We agree with these holdings.

**8.** In addition, the court denied summary judgment against the plaintiffs on the Freedom of Information Act, the Administrative Procedure Act, and the Tort Claims Act claims, except that the claim for damages for false imprisonment under the latter act was dismissed.

**9.** At the time the father brought the action, only one official knew the current whereabouts and identities of the children.

protected interest, we must respectfully disagree.[10] Parents have a fundamental "liberty interest" in the care, custody, and management of their children. See, *e.g., Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). We need not decide whether a parent's visitation rights are constitutionally protected, because Donna has more than a right to visitation. The state court's custody order of March 19, 1975, which incorporated the terms of the informal letter agreement, is ambiguous, but it expressly gives Donna custody of Mike. That it also gives Michael "possession" of the child does not transform Donna's right to one of mere visitation. And in any event Donna was awarded "full care, custody and control" in 1979.

That plaintiff has been deprived of a constitutionally protected right, of course, does not answer the whole question of whether she has a claim for relief. She must also show that she was deprived of this right without due process of law. Ordinarily we would go on at this point to consider what process is due. But here plaintiff got no process at all. At no time was she allowed to challenge, before some impartial authority, the government's conclusion that it was necessary to take Mike into the WPP, and to keep him there, in order to protect Michael's life. We can readily agree with the Marshals Service that *advance* notice of a person's being taken into the program need not be given. That would destroy the whole premise of secrecy on which the Program is based. But it should have been possible to devise some kind of post-deprivation process in which Donna could be heard. We do not see why such a process would necessarily have exposed Michael and Mike to such an unreasonable risk as to justify the permanent destruction of a mother's rights, sanctioned not only by nature but by the courts of Missouri. *But cf. Leonhard v. United*

*States,* 633 F.2d 599, 620 (2d Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981) (expressing doubts, in the context of a constitutional claim brought by relocated children, as to whether a meaningful post-deprivation hearing could be arranged without endangering the children).

The rights of parents, to be sure, are not absolute. Compelling public necessity can justify their termination if proper procedures are followed. We recognize that the Witness Protection Program has been authorized by Congress and is an important part of the war against organized crime. But there is no evidence that Congress intended a separation of parent and child in a situation like that present here. In fact, the Marshals Service itself has in other situations exercised its discretion to accommodate the rights of families. See *Salmeron v. Gover,* Civ. No. 81–0471 (D.D.C. May 27, 1981) (in which the Marshals Service returned children who had been relocated with their mother to the father, to whom a state court had awarded custody, in return for the father's agreement to dismiss his habeas corpus action); *Oversight of the Witness Protection Program: Hearings Before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary,* 95th Cong., 2d Sess. 123 (1978) (in which William E. Hall, Director of the Marshals Service, testified that "I don't think we would ever want to be in a posture of telling one parent: We have relocated your children; you are out of luck forever. I think that would be horrible."). In a situation involving a family in which divorce has occurred, something has to give in order for the Witness Protection Program to have a reasonable chance of working. But here the "give" has all been on Donna's side. She and her son have rights to each other's company that were not created by any government, and

10. *Cf. Ellis v. Hamilton,* 669 F.2d 510, 512 (7th Cir.), *cert. denied,* ⸺ U.S. ⸺, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982) ("It is plain to us that the 'liberty' protected by the due process clause of the Fourteenth Amendment includes the right to the custody of one's minor children and that it would be a deprivation of that liberty without due process of law for persons acting under color of state law permanently to separate the children from their parents without notice and hearing.") (dictum).

716

that no government should be permitted to destroy without more consideration of her rights than has been given here.

### III.

The District Court believed there were genuine issues of fact as to whether government action sufficient to trigger the Fifth Amendment had taken place. After deciding that it lacked jurisdiction to grant injunctive relief against Michael because of the domestic relations exception,[11] the court added that Michael was not transformed "into a government actor by virtue of his acting as a witness for the government and entering the Witness Protection Program. Cf. Bennett v. Pasic [Passic], 545 F.2d 1260, 1263–64 (10th Cir.1976) (witnesses do not act under color of state law)." 539 F.Supp. at 955 n. 8. With respect to the federal defendants, the District Court drew a distinction between the initial inclusion of Mike in the Witness Protection Program and his retention in the program. It held that the extent of the government's involvement in the retention of Mike was not so clear as to authorize summary judgment in favor of either the government or Donna. Id. at 952, 956.

11. We address this issue at part IV, infra.

12. We recognize that an arguably contrary result was reached in Melo-Tone Vending, Inc. v. United States, 666 F.2d 687 (1st Cir.1981). In Melo-Tone a creditor argued that he had been deprived of property without due process when his debtor entered the Witness Protection Program and the government refused to reveal his whereabouts. The First Circuit held that there had been no "taking" of property for which compensation was due because the interference with the creditor's right to collect and enforce payment of his note was merely an indirect consequence of the exercise of lawful governmental power.

We do not believe that our holding conflicts with Melo-Tone. The court in Melo-Tone recognized that there was governmental action; it merely held that the action did not result in a "taking." Even if this analysis were to apply to a claim of deprivation of a liberty interest such as the one asserted here, it is clear that the interference with Donna's right to custody was a direct consequence of the government's action in taking Mike and refusing to reveal his location and identity.

■ Certainly there are issues of fact as to the precise degree of the government's responsibility for Donna's present separation from her son. The trial on the merits of the claims for damages will no doubt flesh out some of these details. Michael could, for example, decide on his own to let Mike go back to his mother, or to let her see him, and we are not sure to what lengths, if any, the government might go to dissuade him. We assume for present purposes that all such subsidiary issues of fact will be resolved in favor of the government. Even after making this assumption, we believe the uncontested facts require a finding of government action. The government was involved in a sequence of events which culminated in the abrogation of Donna's right to custody of her child. Government officials took Mike to a new location and gave him a new identity, a new social security number, and new school records. It has paid Michael's lawyer both to contest the state court's orders and to defend against Donna's claim in this case. It continues to conceal the whereabouts of both Michael and Mike. To assert, as the government does, that it was Michael's sole decision to take and retain Mike in defiance of the state-court order is wholly unrealistic.[12]

In addition, we do not believe that our recent holding in Bergmann v. United States, 689 F.2d 789 (8th Cir.1982), conflicts with our finding of government action. In Bergmann a police officer was killed while investigating a reported burglary committed by a protected witness in the Witness Protection Program. His widow sued under the Federal Tort Claims Act, alleging that the government had negligently selected and supervised the witness. We concluded that the discretionary-function exception to the FTCA applied so that sovereign immunity had not been waived, and that the government was not negligent in supervising the witness because it had no duty to protect the public from the witness, since "the witness protection statutes contemplate only the protection of witnesses and their families—not protection of the public from the witness." Id. at 797. Donna is more than a member of the public; she is the mother of the child taken into the Witness Protection Program by government employees. Moreover, while the protected witness in Bergmann burgled a store and killed a policeman without any assistance from federal officials, it is unlikely that Michael could have taken and kept Mike without the government's help.

Similarly, Michael's conduct constitutes government action for purposes of the Fifth Amendment's Due Process Clause, not because Michael was a witness for the government, but because he could not have taken and retained Mike without government assistance. (He could have absconded with the child, of course, but his goal of evading the state court's custody jurisdiction would have been much more difficult without the active assistance of the United States.) As the Supreme Court has recently observed, a person may be deemed a "state actor . . . because he has acted together with or has' obtained significant aid from state officials . . . ." *Lugar v. Edmondson Oil Co.,* —— U.S. ——, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982). See also *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions.") (citations omitted); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (holding that a privately owned restaurant's refusal to serve a black patron was state action for purposes of the Equal Protection Clause of the Fourteenth Amendment because the restaurant premises were leased from a state agency and were located in a public building maintained by the state, thereby making the state a joint participant in the discriminatory action). This standard is equally applicable to cases involving federal government action under the Fifth Amendment. *E.g., Warren v. Government National Mortgage Association,* 611 F.2d 1229, 1232 (8th Cir.), *cert. denied,* 449 U.S. 847, 101 S.Ct. 133, 66 L.Ed.2d 57 (1980).[13]

## IV.

■ The District Court held that it could not command Michael to return Mike to Donna because of the domestic-relations exception to federal jurisdiction. Ordinarily, a federal court will not grant an injunction to compel a parent to obey a state decree awarding custody of the child to the other parent. *E.g., Bennett v. Bennett,* 682 F.2d 1039, 1042–43 (D.C.Cir.1982); *cf. Lloyd v. Loeffler,* 694 F.2d 489, 493–94 (7th Cir.1982) (disapproving an escalating damage award against the absconding parent as the equivalent of an injunction) (dictum). Nevertheless, we do not believe that the domestic-relations exception is a bar to jurisdiction in this case.

Although the historical interpretation of the origin of the domestic-relations exception is probably incorrect, *e.g., Lloyd v. Loeffler, supra,* 694 F.2d at 491–92, federal courts have consistently refused to entertain diversity suits involving domestic relations for a number of reasons, including

> the strong state interest in domestic relations matters, the competence of state courts in settling family disputes, the possibility of incompatible federal and state court decrees in cases of continuing judicial supervision by the state, and the problem of congested dockets in federal courts.

*Crouch v. Crouch,* 566 F.2d 486, 487 (5th Cir.1978). As we observed in *Overman v. United States,* 563 F.2d 1287, 1292 (8th Cir. 1977), "Federal courts should be extremely wary of becoming general arbiters of any domestic relations imbroglio."

■ Here, however, we are confronted with a case based on federal-question jurisdiction; Donna has asserted a claim "arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331; see *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).[14] It is unclear whether the do-

---

13. The First Circuit found state action in a case which presented a similar issue. In *Downs v. Sawtelle,* 574 F.2d 1 (1st Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978), the plaintiff, a deaf mute of borderline intelligence, became pregnant with her second illegitimate child. The plaintiff's sister, with the help and cooperation of state welfare officials, had herself appointed the plaintiff's guardian and

gave consent for the state to take the child after it was born and for the plaintiff's sterilization. The court held that the sister acted "under color of state law, since her actions were taken in concert with state officials." *Id.* at 10.

14. Although at the time this suit was brought, federal question jurisdiction was not present unless the $10,000 jurisdictional amount was

mestic-relations exception applies to cases brought under the federal-question statute.[15] We need not decide this question, however, because the exception would not apply in this case in any event. Underlying the various reasons advanced to justify the domestic-relations exception is one basic premise: There is a state forum in which the plaintiff may obtain relief. Here, the state court cannot grant effective relief to Donna Ruffalo. Michael refuses to obey the court's custody order, and ordinary processes for discovering his whereabouts are being impeded by the action of the federal government in providing him a new identity. It is unlikely that the state court could compel the federal officials to divulge the whereabouts of Michael and Mike. If the federal officials were made parties to the state court proceedings, the state court might not have jurisdiction to issue an injunction against them. Bator, Shapiro, Mishkin, & Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 429–30 (2d ed. 1973).[16] Even if the state court did have jurisdiction, the officials, once made parties, could remove the action to federal court under 28 U.S.C. § 1442(a)(1) and thus negate the state court's power to grant relief.

Moreover, the District Court was asked to enter an injunction which would confirm the state-court decree and would not in any way conflict with it. Even if we accept the rationale of *Bennett v. Bennett, supra,* that an injunction directing an absconding parent to return a child in accordance with a valid state custody decree would require an inquiry into the present best interests of the child, a task which a federal court is ill-equipped to perform, *id.* at 1042–43, the District Court in this case had other options. In her Motion for Partial Reconsideration of the District Court's April 30, 1982, order, Donna asked for alternative injunctive relief against the federal defendants. She suggested several ways, short of a direct order for the return of the child, in which meaningful relief could be granted, including the possibility that the court could order the government to reveal Michael's whereabouts unless he complied with the state court's orders (or appeared in state court to contest the custody decree on the merits).

## V.

■ We thus disagree, for reasons stated in Parts III and IV of this opinion, with certain of the District Court's legal conclusions. We nevertheless believe that it was prudent for the District Court not to grant any particular form of injunctive relief without further exploration of certain questions of fact. As we have noted, the constitutional rights involved here are not absolute, in the sense that they must prevail at

---

met, we agree with the District Court that this is not a problem here since more than $10,000 in damages was sought. See 539 F.Supp. at 955 n. 8.

**15.** *Cf. Overman v. United States,* 563 F.2d 1287, 1292 (8th Cir.1977) ("There is, and ought to be, a continuing federal policy to avoid handling domestic relations cases in federal court in the absence of important concerns of a constitutional dimension.") (citations omitted); *Hernstadt v. Hernstadt,* 373 F.2d 316, 317–18 (2d Cir.1967) ("When a pure question of constitutional law is presented, this Court has suggested that the District Court may assume jurisdiction even if the question arises out of a domestic relations dispute . . . ."); *Carqueville v. Woodruff,* 153 F.2d 1011, 1012 (6th Cir.1946) ("In the absence of a federal question the whole subject of domestic relations of husband and wife and parent and child belongs to the jurisdiction of the State Courts.") (citations omitted).

**16.** The writer of this opinion has argued that state courts do have jurisdiction to issue injunctions against federal officials, Arnold, *The Power of State Courts to Enjoin Federal Officers,* 73 Yale L.J. 1385 (1964), but the Supreme Court has not yet decided the question. In view of the near certainty of removal if the federal officials were made parties in the state courts, we need not pursue the issue here. *Cf. Pennsylvania Turnpike Comm'n v. McGinnes,* 179 F.Supp. 578 (E.D.Pa.1959), aff'd *per curiam,* 278 F.2d 330 (3d Cir.1960) (suit in state court to enjoin federal official; removed to federal court; *held,* no federal jurisdiction because court from which case was removed had no jurisdiction). Whatever the answer to these interesting issues, the fact remains, as a practical matter, that Donna must get relief in this federal suit if she is going to get it from any court.

all times and in all places against every competing consideration. There is the possibility, for example, that Donna herself may be in league with organized crime, and that her professed desire to see her son is motivated in whole or in part by a desire to get at Michael. There are hints of such a possibility in the record. These hints are nowhere near sufficient to justify a finding against Donna on any such issue, but we think the government should be allowed to present proof on it, and that the District Court should make a finding of fact one way or the other. If this finding should go in favor of Donna, the further question would arise of how best to structure a decree to keep the risk to Michael's and Mike's personal safety to a minimum. Not only is Michael's testimony of value to the government, but his and his son's lives and physical safety are obviously deserving of protection for their own sake.

We believe that some form of equitable relief can be fashioned that will vindicate Donna's rights as a mother without unreasonably endangering her son and former husband. Michael can even be relocated a second time if that is necessary. Such action has been taken in other cases. The chancellor in the person of Judge Sachs is much better suited than we are to decide exactly what kind of relief is appropriate. We offer a few observations that may be helpful, but only by way of suggestion, not as a direction. In the first place, direct interference with the federal defendants' own concept of their duty should be kept to a minimum. The District Court may consider whether it is appropriate to order Michael and Mike to submit themselves to the jurisdiction of the state court. The District Court need not concern itself with Mike's best interests, in the sense of whether his welfare would be better served by his living with his mother as opposed to his father. The state decided that he should be with his mother, and if circumstances have changed, Michael is free to show that in the state forum. The District Court should be mindful, however, of the strong interest in protecting Michael's and Mike's lives and physical safety. If Michael disobeys what-

ever order the District Court enters, it should then fashion some form of alternative relief. It could, for example, order the Marshals Service to assist the state court in enforcing its own order.

We suggest that the District Court hold whatever further evidentiary hearing it thinks appropriate as promptly as practicable. It should be possible to hold a hearing fairly soon, within 30 to 60 days of the filing of this opinion. In order to expedite the matter, which has already gone on too long, we direct that our mandate issue forthwith.

The orders denying immediate injunctive relief are affirmed, with further proceedings consistent with this opinion to take place in the District Court.

It is so ordered.